UNION SULPHUR CO. v. FREEPORT TEXAS CO. et al.

(District Court, D. Delaware. April 18, 1918.)

No. 336.

1. PATENTS ⬤═26(2)—COMBINATION OF OLD ELEMENTS.
  That elements entering into mechanical combination, considered apart from each other, are old and well known, does not negative patentability, where, through inventive faculty, they are assembled so as to produce a new and useful result; the same being true of the various steps entering into a patented process.

2. PATENTS ⬤═32—RESOLUTION OF DOUBT IN FAVOR OF PATENTABILITY.
  Where extreme importance of raising sulphur from great depths to surface of ground was widely recognized prior to an invention, yet the inventor alone achieved the result, the law requires that whatever question may exist as to the patentability of his improved apparatus and process, so far as consistent with reason, should be resolved in favor of patentability.

3. PATENTS ⬤═328—NOVELTY—SULPHUR MINING.
  Frasch patents, Nos. 799,642 and 800,127, for fusing sulphur under ground and raising it to surface in that condition, by means of an air lift pump, in combination with other elements entering into patented combination, held valid and not anticipated.

4. PATENTS ⬤═328—PATENTABLE NOVELTY—SULPHUR MINING.
  Frasch patent, No. 1,008,319, claims 7, 26, and 28 covering apparatus and process for mining sulphur, by fusing it underground and raising it to surface in that condition, held devoid of patentable novelty; new use of old device in connection with sulphur, instead of salt, oil, or other liquid, not conferring patentability.

5. PATENTS ⬤═109—APPLICATION—ALLOWANCE OF AMENDMENT.
  Action of Patent Office, in allowing amendment of application for patent by addition of claims within scope of invention disclosed in original application, was proper.

6. PATENTS ⬤═109—AMENDMENT OF APPLICATION—PRIOR PUBLIC USE.
  Amendment of application for patent, to add claims within scope of invention disclosed in original application, related back to time of filing of original application; and that claims may be defeated by two years' prior public use, such use must have extended over at least two years before filing of original application.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. PATENTS ⊙75—EXPERIMENTAL USE AS "PUBLIC USE."

Experimental use is never "public use," within the meaning of the statute, if conducted in good faith to test the qualities of the invention, and for no other purpose not naturally incidental.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Use.]

8. PATENTS ⊙283(1)—EXPIRED PATENTS—INFRINGEMENT.

If the sulphur mining apparatus and process employed by defendants were the apparatus and process of old expired patents, and nothing more, the charge of infringement cannot be sustained.

9. PATENTS ⊙46—PATENTABILITY—NECESSITY FOR IMPROVEMENT.

An invention may be patentable as possessing utility in the sense of the law, though an improvement may be necessary to its commercial success.

10. PATENTS ⊙328—VALIDITY, ANTICIPATION, AND INFRINGEMENT—SULPHUR MINING.

Claims 2, 3, 6, 12, 19, 21, and 22 of Frasch patent, No. 799,642, and claims 2, 3, 7, 11, and 24 of Frasch patent, No. 800,127, both covering apparatus and process for mining of sulphur by fusing it underground and raising it to surface in that condition, claims relating to air lift, double delivery of hot water, and forcing of hot water through walls of mine cavity, *held* valid, not anticipated, and infringed.

11. PLEADING ⊙327—SUIT FOR INFRINGEMENT—BILL OF PARTICULARS—EFFECT.

In suit for infringement of patents, where plaintiff voluntarily furnished bill of particulars, which stated particulars were given without waiving right to rely on any infringing acts, no exception or objection having been taken to reservation, plaintiff, on question of infringement, is not restricted to defendants' wells—patents covering apparatus and process for mining sulphur by fusing it underground and raising it—mentioned by number in bill of particulars.

12. PATENTS ⊙227—INFRINGEMENT—KNOWLEDGE OF INFRINGER.

An infringer of patents is chargeable with knowledge of the infringing acts.

13. PATENTS ⊙312(3)—INFRINGEMENT—RESPONSIBILITY FOR ACTS OF OTHER—SUFFICIENCY OF EVIDENCE.

In suit for infringement of patents covering apparatus and process for mining sulphur by fusing it underground and raising it in that condition, evidence *held* to prove beyond all reasonable doubt the responsibility of one defendant for infringing acts on the part of the other.

14. PATENTS ⊙287—INFRINGEMENT—LIABILITY FOR OTHER COMPANY.

Community as to officers, directors, and stock is not of itself sufficient to render one company liable for acts of infringement of patent committed by another company on the premises occupied by it.

15. PATENTS ⊙287—AGENCY—JOINT INFRINGEMENT.

The doctrine of agency applies to patent infringements; also the principle that one doing an act which naturally causes another to commit an infringement is responsible for it; further, that where several persons co operate in acts of infringement, they are joint tort-feasors and as such jointly and severally liable in solido.

16. PATENTS ⊙283(1)—INFRINGEMENT—PAYMENT OF COST.

The circumstance that another person pays the cost of an infringement of patent can never serve as justification to the infringer.

17. PATENTS ⊙312(3)—INFRINGEMENT—LACK OF EXPERT TESTIMONY.

In suit for infringement of patents, where plaintiff in prima facie case introduced large volume of competent and convincing evidence as to nature and operation of apparatus and process of patents, its failure to produce any patent expert witness does not prevent court from rendering decision, if in its discretion it feels sufficient testimony has been adduced.

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Union Sulphur Company against the Freeport Texas Company and the Freeport Sulphur Company. Decree in accordance with the opinion.

See, also, 234 Fed. 191, 194.

Charles Neave, Maxwell Barus, and Henry A. Wise, all of New York City, for plaintiff.

Samuel R. Betts, James R. Sheffield, John W. Peters, and Delancey Nicoll, all of New York City, and Thomas F. Bayard, of Wilmington, Del., for defendant Freeport Texas Co.

BRADFORD, District Judge. The Union Sulphur Company, a corporation of New Jersey, brought its bill against the Freeport Texas Company, a corporation of Delaware, hereinafter referred to as the defendant, and the Freeport Sulphur Company, a corporation of Texas, charging infringement of United States patents Nos. 799,642, 800,127 and 1,008,319, and praying the usual relief. It is admitted that the plaintiff is the owner and holder of these three patents. The Freeport Sulphur Company not having been served with process and not having appeared, the only defendant before the court is the Freeport Texas Company.

The patents in suit relate to the mining of sulphur and cover certain alleged improvements in apparatus and process used in that art. The first patent, 799,642, is dated September 19, 1905, and was granted to Herman Frasch for "Improvements in Processes of Mining Sulfur." In the description it is stated:

"This invention relates more particularly to the removal of sulfur from deposits in the earth which consist of or contain free sulfur by fusing the sulfur in the underground deposit and raising it in a melted condition."

The second patent, 800,127, also bears date September 19, 1905, and was granted to Frasch for "Improvements in Apparatus for Mining Sulfur." The description contains precisely the same statement hereinabove quoted from the first patent. The third patent, 1,008,319, is dated November 14, 1911, and was granted to Frasch, assignor to the Frasch Sulphur Process Company, for "Improvements in Mining Sulfur." The description states:

"This invention relates more particularly to mining sulfur by fusing the latter in its natural underground deposit and removing it to the surface while it is in the melted condition."

The fusion and raising of sulphur in and from deposits deep in the bowels of the earth had never been effected or attempted prior to the inventions of the patents in suit and of certain other patents granted to Frasch in 1891. Prior to the patents in suit the mining of sulphur was principally confined to Sicily, where the sulphur deposits were found at or comparatively near the surface of the ground. For obtaining such of the sulphur as was not at the surface shafts were sunk and from them the sulphur ore was brought to the surface, where the sulphur was separated from the ore. While this mode of sulphur mining was practicable and convenient where the sulphur deposit was comparatively near the surface, it was otherwise where the

deposit was located at a great depth. In the latter case the cost of sinking shafts was so increased as to become prohibitive, and the presence of quicksand and water presented serious obstacles to the securing of the sulphur, and was fraught with grave peril to life. So long ago as 1869 the sulphur deposits in Calcasieu Parish, Louisiana, now mined by the plaintiff, were discovered, and were recognized as being very rich. These deposits were at such a depth as to present a mining problem. Whatever its difficulty, it was regarded at the time by mining engineers as comparatively simple. In that year, Professor Hilgard, of the University of Mississippi, in a report to the president of the Louisiana Petroleum & Coal Oil Company, published in the Engineering and Mining Journal of September 28, 1869, said with respect to a sulphur deposit on the premises now mined by the plaintiff:

"There are, undoubtedly, considerable practical difficulties to be overcome in sinking this shaft of 443 feet to the surface of the sulphur bed; but they are such as, in the hands of a skilful practical mining engineer with sufficient means at command, can readily be overcome. To begin the work with limited means would be certain failure. *That*, once successfully accomplished, it is my conviction that the working of the mine would be easy and in the highest degree remunerative—capable, in view of the difficulty under which the production of Sicilian sulphur labors, of controlling the sulphur market of the world, and adding to the prosperity of the whole country by cheapening the production and improving the quality of that great fundamental agent, 'sulphuric acid'; the preparation of which from impure pyrites is so often a source of annoyance and loss to all kinds of manufacturers."

After Hilgard's report the Calcasieu Sulphur & Mining Company acquired the property containing the sulphur. A. Granet, the chief engineer of that company, in 1871, made a report as to the sulphur deposits and the methods of mining them. In this report he states:

"A first exploring shaft, sunk originally with a view to discover the stratum of the petroleum oil, indicated by the surface of the soil, found a stratum containing too little petroleum to be worked profitably; but on the other hand, after coming at a depth of 380 feet upon a sheet of sulphurous water, it struck and went through, at the depth of 443 feet, a stratum of sulphur of great value, having a thickness of 108 feet. * * * The fragments withdrawn from the bottom, after each stroke, have demonstrated in a clear and precise manner that the entire stratum is, from the top to the bottom, of exceptional richness, and that it is very easy to work it. As for the well which is to be bored for the purpose of extracting the sulphur, I have every reason to believe that there is no serious obstacle in the way. * * * I cannot expatiate here upon the technical details of the various processes of sinking shafts through crumbling or water-bearing strata; but I will simply state, that an extracting shaft, although difficult to execute, nevertheless presents no obstacles and no problems of construction which a competent engineer cannot either solve or overcome. As to the working of the sulphur bed itself, this is attended with no difficulty, as the rock without being very hard to break, is nevertheless sufficiently compact and self supporting to allow of the safe construction of all the galleries which may be required, without the need of props or wood-work in the interior. * * * The sulphur stratum recently discovered is 428 feet below the surface of the soil, and the shaft to be sunk in order to reach it through the various superincumbent strata, can be constructed without any serious difficulty. The mineral constituting this stratum, contains an average of 77 per cent. of pure sulphur; when the extracting well shall be in operation, the working of it shall be very simple and cheap."

Pursuant to Granet's recommendation, the company obtained at large expense from France and Belgium machinery and apparatus for sinking a shaft. The project was a failure, for after the shaft had been sunk only a short distance below the surface the quicksand and water presented such obstacles as to compel the abandonment of the enterprise by the company. In 1879 the Louisiana Sulphur & Mining Company acquired the same property now mined by the plaintiff, and, like the Calcasieu Sulphur & Mining Company, vainly attempted to mine sulphur by means of shafts. In or about 1890 the same property was acquired by the American Sulphur Company, which, after unsuccessfully carrying on operations abandoned in 1893 the attempt to mine after meeting with difficulty from quicksand, and also from sulphurous gas in the shaft, resulting in the death of five men. The last-named company expended from $300,000 to $350,000 in the purchase of the mining property and in its effort to secure sulphur, and then abandoned the enterprise simply because it was believed impracticable to extract the sulphur by means of mine shafting, the only method then or theretofore used in obtaining sulphur deposited at any considerable depth below the surface. E. J. Schmitz, a mining engineer of the American Sulphur Company, in a report to that company June 3, 1893, said:

"While I have only small hopes that the property of your company can be ever mined with success by the common methods (shafts, etc.) on account of the porous and cavy structure of the formation and the water masses present in the Sulphur deposits and formation—I think it but proper that the directors of your company should do no decisive step as to the abandonment of the property until they have fully satisfied themselves that the waters of the Sulphur Horizon below the Big flows are too large to be controlled, and as well that there exists no other practical methods of extracting the Sulphur than by the common Shaft methods."

The repeated and long continued unsuccessful attempts, covering a period of more than twenty years, by the various companies above mentioned to secure sulphur from the deposits in Louisiana afford conclusive evidence of the widely recognized importance of discovering some means of securing the desired result—a result so desirable as to constitute a powerful incentive to all those interested in the sulphur industry to devise effectual means to secure its attainment. Yet it appears from the evidence that until after the American Sulphur Company abandoned its attempt in 1893, with the exception of Frasch, no one had any conception or idea of fusing sulphur in its natural bed or deposit in the earth and bringing it to the surface in a melted condition. All efforts theretofore had been confined to its extraction through means of the sinking of shafts. Frasch, however, several years before the abandonment by the American Sulphur Company of its enterprise as above mentioned formed the broad conception of obviating all necessity for the mining of sulphur through shafting by fusing the sulphur in its natural deposit and bringing it while so fused to the surface through piping; and his broad conception, though mistaken in some respects, was embodied in three patents, commonly referred to as the expired Frasch patents, granted to him October 20,

1891, being Nos. 461,429, 461,430 and 461,431. In No. 461,429 Frasch states:

"This invention relates to the removal of sulphur from deposits in the earth which consist of or contain free sulphur and is particularly useful in the removal of the sulphur from deposits which are overlaid with beds of quicksand, and which therefore cannot be mined in the usual way by sinking a shaft. * * * The invention consists in the fusion or melting of the sulphur in the mine or underground deposit and its removal in a fused or melted condition. To fuse the sulphur, use is or may be made of a heat-conveying fluid or vehicle, preferably a cheap liquid, such as water, although the invention extends to the use of a heat-conveying fluid or vehicle in general. Further, the invention includes, generally, the fusing of the sulphur in the underground mine or deposit as an aid to its removal from the mine."

In No. 461,430 Frasch, after stating the subject to which the invention related, as in No. 461,429, says:

"The present invention consists in apparatus whereby the removal of the sulphur from the mine or underground deposit in a liquefied state is effected or facilitated. In accordance with the said invention a well is sunk into or through the underground sulphur deposit or mine, and a pump or other known or suitable means of forcing circulating or elevating liquids is employed to remove the liquefied sulphur or the liquefied sulphur and vehicle by which it is liquefied."

In No. 461,431, after stating the subject to which the invention related, as in Nos. 461,429 and 461,430, Frasch states:

"The invention consists in liquefying the sulphur in the mine or underground deposit by means of a solvent vehicle and lifting the solution to the surface by a pump or other known or suitable means of raising liquids. * * * Further, the invention consists in inducing a circulation of a solvent in the underground cavity (whether wholly or partly full) by introducing the fresh liquid near the bottom of the cavity or point at which the sulphur solution is removed. If the liquid be hot when introduced, the high temperature makes it specifically lighter than the liquid already in the cavity, so that it tends to rise, and thus induces a circulation of the whole fluid mass. The solution of the sulphur in the vehicle also makes the liquid in the cavity specifically heavier, and consequently increases the differences in density between the inflowing and the present liquid."

While as above stated, the broad conception of fusing sulphur in its underground bed and raising it to the surface was embodied in the expired Frasch patents, it appears from the evidence that the process and apparatus described in them were devoid of commercial utility. On the other hand, the fusion and raising of sulphur by the apparatus and process covered by the patents in suit have been accomplished with phenomenal success. This is sufficiently indicated by the amount of sulphur obtained by the plaintiff during a series of years under the apparatus and process of the patents in suit; it being as follows: 1902, 4,983 tons; 1903, 23,715 tons; 1904, 79,187 tons; 1905, 218,950 tons; 1906, 287,590 tons; 1907, 185,882 tons; 1908, 367,896 tons; 1909, 270,725 tons; 1910, 246,510 tons; 1911, 204,220 tons; and 1912, 786,605 tons. The development of the sulphur mining industry in this country exclusively under the apparatus and process of the patents in suit has been such that Sicily is no longer a competitor in the American market, and large quantities of sulphur are annually exported from the United States.

The first patent in suit, 799,642, is for a process, and the principal features of the apparatus for conducting the process are as follows: There is a pipe or casing $A$, sunk or driven down through the surface of the ground to the stratum of rock above and covering, mediately or immediately, the sulphur deposit. Inside of this pipe and concentric with it is a smaller pipe $D$, which extends from the surface of the ground through, and, in a drilled hole of the proper diameter, beyond the bottom, of pipe $A$, through the stratum of rock and into and nearly through the sulphur deposit. In operating the apparatus hot water is forced down through the pipe $A$, referred to as "top" water, and is also forced down through the pipe $D$, referred to as "bottom" water. Within the latter pipe and concentric therewith is a third pipe $E$, which extends from the surface downward through a plug sealing the lower end of the pipe $D$, to a point within a strainer $D''$, the latter being an extension of the pipe $D$. The pipe $D$ has perforations above the plug sealing its lower end for the discharge of hot water into the sulphur bed. Pipe $E$ is intended for the passage of melted sulphur from the deposit to the surface. Within and concentric with the last named pipe and extending from the surface down to a point near the lower end of the pipe $E$ is an air injecting pipe $F$, provided at its lower end with a perforated piece of zinc or other metal not corrodible by sulphur. Through this pipe air is forced downward through the perforations into the melted sulphur in pipe $E$, lessening the specific gravity of the contents therein and facilitating the raising of the sulphur through the pressure of the hot water in the well and the difference in specific gravity between such hot water and the aerated contents of the sulphur pipe. The water heated to the proper temperature, which is forced down through the pipe or casing $A$, on reaching its lower end escapes therefrom and passes down around and on the outside of pipe $D$, until coming in contact with the sulphur it melts the same and begins the formation of a cavity. The hot water which is forced down through pipe $D$ escapes through perforations near its lower end, as above stated, into the sulphur, melting the same. The "top" water from pipe $A$, together with the "bottom" water from pipe $D$, if of proper temperature will melt the sulphur and bring it in contact with the strainer connected with the bottom of pipe $D$, and cause it to pass into the strainer. The melted sulphur being of greater specific gravity than the water will remain in the strainer until through its accumulation it seals the lower end or rim of the sulphur pipe $E$; and as long as pipe $E$ extends below the surface of the sulphur pool the melted sulphur can be forced or lifted up through pipe $E$ to the surface of the ground. In conducting the process of the patent the hot water, whether heated under pressure, by steam, or otherwise, must be of a temperature sufficiently high and must be forced down into the mine in sufficient quantity, not only to melt the sulphur at the bottom, but to maintain it in a melted condition until it reaches the surface. The degree and quantity of heat and the quantity of water requisite for the efficient carrying on of the process are subject to variation to a considerable extent under different conditions. Where, as is the case with

the plaintiff's sulphur bed, and also the sulphur bed on the premises occupied by the Freeport Sulphur Company, the sulphur formation is permeated with water it is necessary to increase the volume or temperature, or both, of the hot water pumped down to such an ex-tent as to force back the subterranean cold water in order to insure the melting of the sulphur in sufficient quantity and to maintain it at a proper degree of temperature to permit it to be raised in a melted condition to the surface. But while it is necessary that suf-ficient heat should be applied to the sulphur to permit it to be raised to the surface in a melted condition, it is absolutely necessary that the melted sulphur should not be so hot as to pass the darkening point and become pasty or unduly viscous. Such superheating is ab-solutely destructive of the process. The proper application of heat to the sulphur presented one of the most difficult problems for solu-tion by Frasch.

The second patent in suit, 800,127, is for apparatus for carrying on the process of the patent just considered. The patents were divi-sional, and in view of what has been said about the process patent it is unnecessary at this point to indulge in what would be practically a repetition.

The third patent in suit, 1,008,319, is for "Improvements in Min-ing Sulfur." In the description it is stated:

"I have discovered that the operation of melting the sulfur out of porous rock is liable to detach masses of rock, which in falling will choke the inlet and outlet openings of the mine piping (or of one or more of such openings); and I have further discovered that this condition can be remedied or amelio-rated by providing the well hole within the deposit with a perforated lining which will prevent detached masses of rock from reaching the interior mine piping. Such masses may close some of the perforations in the said lining; but these are, or may be, so numerous and so widely distributed that only a general cave in would be apt to close enough of them to shut off the inflow of the sulfur or the outflow of the fusing liquid. Moreover, when the lining is present, a mass of rock detached from the upper part of the deposit is apt to lodge there against the lining; whereas, without such lining it might fall to the bottom of the well hole, where it would be objectionable. Again, a mass of rock lodging against the lining does not close the well hole; but it would do so to a greater or less extent if lodged against the interior mine piping."

The interior piping shown in the drawings of this patent, though differently lettered, is the same as that set forth in the first and sec-ond patents in suit. Surrounding the interior piping below the serv-ice of the rock and concentric therewith is a pipe containing orifices and referred to as the perforated lining e. The hot water is forced down the pipes a and q, corresponding to the pipes A and D, in the first and second patents in suit. The hot water which "passes down the exterior pipe or casing a enters the upper part of the deposit, being distributed over a certain vertical distance by the perforated lin-ing c." The hot water from the pipe a escaping through the perfora-tions of the lining "melts the sulphur in the upper part of the de-posit"; while the hot water passing down the interior pipe q, cor-responding to pipe D in the first and second patents in suit, "escapes near the bottom of the deposit through the openings in the wall of said

pipe above the annular plug *t,* and also through the openings in the perforated lining,". and melts the sulphur at the lower end of the well. The melted sulphur is then raised to the surface by means of apparatus and in a manner corresponding to the apparatus and process employed in the first and second patents in suit. The essence of the invention covered by the third patent in suit, so far as pertinent to the mining of sulphur under those two patents, consists in the provision and use of a perforated lining to obviate or minimize the difficulty resulting from the stoppage of the free flow of hot water into the sulphur deposit through the giving way and falling in of the walls of the well. The employment of the perforated lining is unquestionably useful in that in addition to the avoidance in large measure of the ill effects resulting from the stoppage of the free flow of the hot water, it distributes the same in the sulphur bed throughout a greater vertical distance, the sulphur being melted contemporaneously at a greater number of points therein.

The claims in issue of No. 799,642, the first patent in suit, are Nos. 2, 3, 6, 12, 19, 21 and 22, as follows:

"2. In sulfur-mining in porous rock, the improvement consisting in forcing water heated above the temperature at which melted sulfur begins to darken into the underground deposit and out through the walls of the mine-cavity, so that it flows away through the surrounding rock, and removing the melted sulfur which separates itself by gravity from the water in the mine, substantially as described.

"3. As an improvement in sulfur-mining, and in conjunction with the fusion of the sulfur in the underground deposit, the introduction into a column of the melted sulfur of air or other aeriform fluid, so as to form a column of melted sulfur of diminished density to be raised by pressure in said deposit, substantially as described.

"6. In sulfur-mining in porous rock, the improvement consisting in forcing hot water into the underground deposit and out through the walls of the mine-cavity, so that it flows away through the surrounding rock, allowing the melted sulfur which separates itself by gravity from the water in the mine to collect until it seals the end of the sulfur-pipe, and introducing air or other aeriform fluid into the column of melted sulfur so as to reduce its density and allow it to be raised by the pressure in the mine-cavity, substantially as described.

"12. As an improvement in sulfur-mining by fusion underground, in conjunction with the removal of the melted sulfur, the introduction concurrently with said removal of the hot water for fusion into the underground sulfur deposit above and in proximity to the intake for the melted sulfur and also at a higher level near the upper part of the mine-cavity, substantially as described.

"19. In mining by fusion in porous rock, the improvement consisting in melting the material being mined in the underground deposit by means of fusion liquid introduced thereinto, which fluid is forced out through the walls of the mine-cavity into the rock beyond, and removing the melted material, substantially as described.

"21. In mining by fusion, the improvement consisting in introducing fusing fluid into an underground deposit near the top and bottom of the mine-cavity contemporaneously, substantially as described.

"22. In mining by fusion, the improvement consisting in introducing fusing fluid into an underground deposit near the top and bottom of the mine-cavity contemporaneously and forcing the said fluid out through the walls of said mine-cavity into the rock beyond, substantially as described."

The claims in issue of No. 800,127, the second patent in suit, are Nos. 2, 3, 7, 11, 21 and 24, as follows:

"2. Apparatus for mining by fusion, consisting, in combination with means for removing the melted material, of mine-piping connected with means for forcing water at the fusing temperature through said piping into an underground porous deposit, and means whereby said deposit is closed against the return of the hot water to the surface of the ground, so that the said water is forced to flow away through the surrounding porous rock, substantially as described.

"3. Apparatus for mining by fusion, consisting of a mine-pipe connected with means for forcing water at the fusing temperature through said pipe into an underground porous deposit, and means whereby said deposit is closed against the return of the hot water to the surface of the ground, so that the . said water is forced to flow away through the porous rock, in combination with a mine-pipe up which the melted material is raised from said deposit, and a pipe conveying aeriform fluid and discharging the same into the said mine-pipe up which the melted material is raised, substantially as described.

"7. Apparatus for mining by fusion, composed of two pipes for conducting hot water into the underground deposit, terminating one at a higher and the other at a lower level, a pipe up which the melted material is raised from said deposit, and a pipe conveying compressed aeriform fluid and discharging it into the said mine-pipe up which the melted material is raised, substantially as described.

"11. Apparatus for mining by fusion, having mine-piping with delivery-openings at the upper and lower parts respectively of the mine-cavity, in combination with means whereby fusing fluid is delivered through said openings simultaneously to the upper and lower parts of said mine-cavity, out of which latter the water flows during such simultaneous delivery, substantially as described.

"21. Apparatus for mining by fusion, having a mine-pipe provided at its lower end with a strainer, in combination with a mine-pipe opening into said strainer, the first-mentioned pipe having a discharge above the lower end of the last-mentioned pipe and a closure between said discharge and said strainer, substantially as described.

"24. Apparatus for mining by fusion, having means for introducing fusing fluid into the deposit and for removing the melted material, which means includes provisions for delivering compressed aeriform fluid into the pipe through which the melted material is removed, substantially as described."

The claims in issue of No. 1,008,319, the third patent in suit, are Nos. 7, 26 and 28, as follows:

"7. The process of mining by liquefaction underground of the substance to be mined, consisting in inserting in the deposit a stout perforated lining of approximately at least the diameter of the well bore, introducing liquefying fluid into the interior of said lining, causing it to flow out into the deposit through the perforations in said lining, which thus distributes the outflowing fluid over a greater depth of the deposit than it would occupy but for said lining and which also prevents the stoppage of said flow outward by the falling in of masses too great to be carried away by the current of said fluid, and removing the liquefied substance, substantially as described.

"26. A well sunk into a deposit of naturally solid but liquefiable substance and provided with each of the three features following, namely, a stout perforated lining in said deposit of approximately at least the diameter of the well bore, an interior fluid delivery pipe with outlet below a large part of the perforations of said lining, and means for supplying liquefying fluid for delivery into the deposit in part after delivery into said lining above the outlet of said interior pipe and passage through perforations in said lining and in part after conveyance through said interior pipe to a lower level, substantially as described.

"28. The process of mining by liquefaction underground of the substance to be mined, consisting in inserting in the deposit a stout perforated lining of approximately at least the diameter of the well bore and an interior fluid delivering pipe with outlet below a large part at least of the perforations of

said lining, introducing liquefying fluid into the deposit in part after delivery into said lining above the outlet of said interior pipe and passage through perforations in said lining and in part after conveyance through said interior pipe to a lower level, and removing the liquefied substance, substantially as described."

[1] There is no denial on the part of the defendant of the utility of the three patents in suit, or that signal success in the mining of sulphur has not resulted from the use of the apparatus and process covered by them. Nor is it denied that Frasch was the only person whose inventive genius has produced the revolution in the sulphur mining industry through the substitution for the old system of sinking shafts of the infinitely better methods devised by him. But it is contended that the three patents in suit are invalid in view of the prior art, including Frasch's earlier expired patents, or through anticipation by those patents. It is true, as before stated, that the broad conception of fusing sulphur in its natural bed or deposit in the earth and bringing it to the surface in a melted condition was not embodied for the first time in any of the patents in suit. It was disclosed in the expired Frasch patents. The patents in suit are only for improvements in the apparatus and process of the earlier Frasch patents, but the improvements covered by the patents in suit marked the difference between success and failure in sulphur mining. Much stress has been laid by the defendant upon the fact that most, if not all, of the parts constituting the apparatus of the patents were old and well known. That the various elements entering into a mechanical combination, considered separately and apart from each other, are old and well known, does not negative patentability where through the exercise of the inventive faculty they are so assembled as to produce a new and useful result. Patentable invention is often displayed in the selection and adjustment of old and well-known devices to be used in combination to produce such a result. And by analogy the same is true of the various steps entering into a patented process.

It is urged that on the expiration of the earlier Frasch patents the practice of the inventions covered by them was open and free to the world, and that the difference between those inventions and the inventions of the patents in suit was not sufficient to admit of the patentability of the latter. It is thus necessary to ascertain some of the features distinguishing the apparatus and process as improve under the later patents from the apparatus and process of the expired patents, which converted failure into success.

The apparatus disclosed in the patents in suit differs in material points from that disclosed in the expired patents. One of the most important differences is to be found in what is known as the "air-lift" or air-lift pump. No one of the expired patents shows anything corresponding to the pipe $F$ through which air is forced down the well and into the melted sulphur contained in the pipe $E$, thereby lessening the specific gravity of the contents and facilitating the raising of the sulphur to the surface. This "air-lift" constituted a difference of much importance between the apparatus of the patents in suit and that of the expired patents, and produced a radical difference between their respective functions. Another important difference between the ex-

pired patents and the patents in suit relates to the delivery of hot water into the well; the later patents providing for its delivery through two hot water pipes simultaneously, one of them delivering "top" water and the other "bottom" water, whereby the melting of the sulphur is increased by a double delivery of hot water, which not only serves to maintain the required degree of heat in the water reaching and intended to operate upon the sulphur in the cavity, but to force the cold water in the sulphur bed back to such distance from the well as not to interfere with the melting of the sulphur. The apparatus of the third patent in suit, No. 1,008,319, differs from that of the expired patents in having the perforated lining already described, insuring the protection of the well and a more extensive distribution throughout a vertical distance of the hot water into the sulphur bed at a large number of points.

[2] With respect to patentability it is unnecessary at this point to consider differences between the apparatus and process of the patents in suit and those of the expired patents other than those arising from the employment of the air-lift, the double delivery of hot water, and the perforated lining. In these three particulars the patents in suit substantially differ from Frasch's earlier inventions. Operations under the expired patents lacking these improvements fell far short of realizing the aims and expectations of the inventor, but under and with the improved process and apparatus of the patents in suit attained a commercial success that could hardly have been anticipated. After many and uniformly unsuccessful attempts to raise sulphur from the Louisiana beds Frasch secured the earlier patents covering his broad conception of the melting of sulphur underground and bringing it to the surface. But broad and meritorious as was that conception he had still fallen short of providing the means for its successful realization. And it was only after the lapse of a number of years from the date of the earlier patents that he found the means for the full accomplishment of his aims. The extreme importance of effecting the raising of sulphur from great depths to the surface of the ground was widely felt and recognized. It had long claimed the attention of scientific men and mining engineers. Yet it was Frasch, and he alone, who reached the long sought goal. Under these circumstances the law requires that whatever question may exist as to patentability in the improved apparatus and process covered by the patents in suit should, so far as consistent with reason, be resolved in favor of patentability. The conclusion of patentability is not, however, exclusively to be based upon the presumption arising from the grant of letters patent, or from the meeting of a long-felt need, or the utility of mining sulphur under the improved methods of the patents in suit, but also upon the essential character of the improvements as respects invention, novelty and utility.

[3] The defendant denies that there was anything patentable in the air-lift, and contends that it appears from the descriptions of the expired patents that Frasch understood and contemplated that an air-lift pump might or should be employed in raising the melted sulphur to the surface. Frasch, it is true, states in patent 461,429 that "the liquefied sulphur need not be forced up by the heat-conveying liquid,

but may be pumped up in any ordinary or suitable way"; and further, that "the term 'pumping' is intended to cover the movement by means of a pump or any known or suitable substitute for a pump. A column of liquid, as hereinbefore indicated, is one such substitute." The column of liquid referred to was hot water in the pipe B, which, being subjected to pressure was intended to force melted sulphur together with hot water up through the sulphur pipe C. It is urged that at the time of the granting of the expired patents there were only three methods or kinds of pumping known for use in deep wells, one by hydrostatic pressure, shown in the expired patents, another by a "sucker-rod" pump, also shown therein, and a third by an air-lift pump; and, therefore, that as the expired patents disclose hydrostatic pressure and a sucker-rod pump, pumping "in any ordinary or suitable way" must necessarily have been intended to apply to an air-lift pump. This contention, however, imputes to Frasch an intent or understanding either existing or chargeable to him as a practical engineer, touching the use of an air-lift pump, from which the conclusion is unwarrantably drawn that the provision in the patents in suit of an air-lift pump wholly lacked patentability. There is no direct evidence whatever that Frasch used the expression "pumped up in any ordinary or suitable way" with reference to an air-lift pump. It is true that such pumps had been used in other branches of industry, but never in connection with the mining of sulphur. They had been used in deep wells, including salt and oil wells, and possibly some others, but such prior use of the air-lift did not present or suggest the problem of its application to sulphur wells. The problem to be solved was a difficult one and arose from the character of the plaintiff's sulphur formation as well as the nature of the conditions under which alone an air-lift pump could be successfully used in sulphur mining. At the time of and for a number of years after the granting of the expired patents Frasch had been led to believe by the reports of scientific men that the sulphur deposit of the plaintiff was a dry, water-tight formation, such as those known to exist in Sicily. This belief accounts for some of the most dominant ideas disclosed in the description of the earlier patents. Acting upon the theory of a water-tight formation, and that, therefore, water pumped down into the sulphur deposit must return to the surface, he provided in patent 461,429 the two pipes B and C, the former being the pipe down which hot water was pumped into the sulphur well, and the latter being the pipe through which the sulphur melted by the hot water was intended to be forced to the surface through the pressure to which the column of water in the hot water pipe was subjected, in conjunction with a sucker-rod pump. There were two reasons why such a process was necessarily a failure so far as commercial success was concerned. One was that the sulphur deposit was not water tight, as was supposed, but porous, and consequently the hot water forced down into the mine would escape through the porous formation to such an extent as to so diminish the pressure of the hot water upon the sulphur pool as to seriously impede, if not wholly prevent, the raising of the melted sulphur to the surface. The other was that, the sulphur having about twice the specific gravity of the hot wa-

ter, when the melted sulphur and the hot water were in the sulphur pipe the sulphur had a tendency to sink to the bottom of the pipe, while the hot water was delivered at the surface instead of sulphur. In patent 461,430 Frasch sought to avoid the necessity of attempting to raise melted sulphur and hot water commingled in the same pipe to the surface, and to that end provided an additional pipe $T$, up which the hot water should be forced to the surface under the pressure of the column of hot water forced down into the sulphur chamber or cavity. The lower end of this pipe $T$ was above the level of the surface of the sulphur pool and so adjusted that, while the melted sulphur would seal the pipe $C$ and under the pressure of the column of hot water in the pipe $B$, in conjunction with a sucker-rod pump, would be raised to the surface, the pipe $T$, so placed that it could not be sealed by the melted sulphur, would afford a vent to the hot water under the pressure of the water in the chamber or cavity transmitted through the column of hot water in the pipe $B$. Undoubtedly this was a step in the right direction, but by no means solved the problem confronting Frasch. What has just been said relative to the feature of the escape of the hot water pumped down into the mine through the porosity of the formation also applies here. Experiments prior to the application for any of the patents in suit demonstrated that the sucker-rod pump was a failure as applied to the raising of melted sulphur. Unlike its use in deep salt wells, oil wells, or water wells, where a change in the temperature of the liquid to be pumped did not affect its efficiency, its use in connection with the pumping of melted sulphur rendered it liable by reason of comparatively slight changes of temperature to become clogged and rendered useless through the cooling and congealing of the sulphur even in slight degree. The air-lift had never before been used for raising any liquid the continuous flow of which was dependent upon its maintenance at a very high temperature. Nothing can be more unreasonable than to assume that Frasch when he took out his original patents had the slightest idea of the applicability of the air-lift to the raising of melted sulphur. If he had supposed that the air-lift could be so employed he would, in view of its marked efficiency, undoubtedly specifically have claimed or shown it in those patents. The successful use of an air-lift pump in connection with the mining of sulphur could be had only under conditions rendering its applicability to that industry far from obvious. The necessity of maintaining the melted sulphur in a condition of such fluidity and in such quantity as to permit of the operation of the air-lift presented problems of peculiar difficulty. It was necessary to the proper fluidity of the sulphur that its temperature should be kept within comparatively narrow limits. If not sufficiently heated the required degree of fluidity could not be obtained. If heated beyond a certain point the sulphur becomes unduly viscous or pasty. In either event the operation of the apparatus and the process becomes impracticable. Further, the air forced into the bottom of the sulphur pipe under great pressure, in expanding with its ascent through the pipe is attended with such a fall in temperature as has a tendency to congeal the liquid sulphur and defeat the process. Not to mention other details it is evident that the use of an air-lift

pump in the mining of sulphur is attended with difficulties of such a character as to render its selection and efficient operation as one of the co-operating elements in the patented combination the result of an exercise of the inventive faculty. In view of the great desirability and importance of the air-lift pump and of Frasch's admitted inventive genius, specifically directed to the development of efficiency in the process and apparatus employed in the sulphur mining industry, I can only conclude that more than a mere engineering problem was involved, and that novelty and patentability were present in the adoption and adaptation by Frasch of the air-lift pump in combination with the other elements entering into the patented combination.

The expired patents provided for the delivery of the hot water in the well normally through only one hot water pipe or casing *B,* and with respect to this pipe Frasch states, in patent 461,430, that "instead of having casing *B* terminate at the rock above the sulphur, it may be extended into the mine and form a conduit for the introduction of the hot water." The process patent, 461,429, contemplated the forcing, in a certain contingency, of hot water down into the well through the sulphur pipe *C.* In the description of that patent it is stated:

"In case the temperature should become so low in the well that the sulphur does not melt rapidly enough, water of a higher temperature * * * may be pumped down the tubing *C* (instead of casing *B,* as usual), and this water on its escape at the bottom of the well, and during its ascent to and through the casing, heats the mass and raises the average temperature. When this has reached the desired degree, the hot water * * * is forced again down the casing *B* and sulphur is forced up the tubing *C.*"

If, however, the water forced down the casing *B* was sufficiently hot it was intended that it should be continuously supplied to the well through that pipe. It is clear from the drawings and description of the patent that no simultaneous double delivery of hot water into the well was contemplated or possible in the process of this patent. And the same may be said of the apparatus covered by No. 461,430 for the conduct of the process. The theory of the earlier Frasch patents was, as stated in 461,429, that there was "a closed circuit which includes a chamber in the sulphur or sulphur-bearing rock, and through which water at a temperature sufficient to fuse the sulphur is forced." Both the sulphur pipe and the casing *B* were parts of this "closed circuit"; and so long as the hot water continued to be forced down the casing *B* hot water could not be forced down the sulphur pipe *C,* and so long as hot water should continue to be forced down the sulphur pipe it could not be forced down through the casing. Hence, the contemporaneous use of both the casing and the sulphur pipe for the introduction of hot water into the well could not be effected. This is in accord with the statement made by Frasch in patent 461,430, that "this arrangement enables the water to be forced into the mine through either the casing *B* or the tubing *C.*" In the first patent in suit Frasch says:

"In my said patent No. 461,429, the hot-water pipe (therein termed a 'casing'), by which the hot water is carried down into the mine opens at the bottom into the upper part of the cavity from the bottom of which the melted sulphur is removed; but in my apparatus, patent No. 461,430, * * * it is shown also as being extended into the sulphur deposit and terminating

a short distance above the lower end of the pipe up which the melted sulphur is raised. In both cases, however, the hot water is introduced at one place only and there is only one hot-water pipe. A feature of the present invention consists in delivering the hot water into the sulphur deposit at different levels—namely, at a short distance above the intake for the melted sulphur and at the upper part of the sulphur bearing deposit. * * * By the upper delivery a flow of the hot water over the walls of the cavity is secured, while the lower delivery prevents the chilling of the sulphur."

While the first two patents in suit permit and provide for a simultaneous double delivery of hot water into the well at higher and lower levels, such a step was impossible under the expired patents. Prior to the patents in suit, in order to secure a delivery of hot water in the well during the pumping of sulphur only one pipe could be employed, and that pipe extended either to the bottom of the well or to the top of the sulphur deposit, and if adjusted for a delivery of hot water at one level the hot water could not be delivered at another level without a readjustment of the apparatus. Frasch was the first to conceive and put in operation the double and simultaneous delivery of hot water at different levels. This invention not only was novel but possessed much merit. If bottom water only had been delivered to the well a large portion of it by reason of its lessened specific gravity would have risen into and through the cold water of the formation and becoming chilled could not have melted the sulphur for any considerable vertical distance. On the other hand, if top water only had been delivered to the well it would not have sunk to the bottom of the cavity and the process would have been defeated. But by virtue of the apparatus and process of the patents in suit the simultaneous and double delivery of hot water at different levels under pressure not only brings hot water possessing melting temperature in contact with the entire walls of the cavity, but by reason of the pressure forces the same out through the walls of the cavity, driving the cold water to such a distance as not to interfere with the melting of the sulphur. The double delivery under properly adjusted pressure, in connection with the other elements of the process and apparatus combinations of the patents in suit, when compared with the delivery of the hot water under the expired patents, so clearly discloses patentability as to render further elaboration on this point unnecessary; there being neither anticipation nor anything in the prior art negativing it.

The apparatus of the second patent in suit discloses a strainer $D''$ into which the sulphur pipe $E$ opens. Frasch in the description states:

"The hot-water pipe $D$, as shown, has a plug $D''$ with a perforation therein through which the sulphur-raising pipe $E$ passes. On said plug $D'$ the collar $E'$ of said pipe $E$ rests. The lower end of the pipe $E$, as shown, opens into a strainer $D''$, formed by an extension of the pipe $D$. The wall of the pipe $D$ just above the plug $D'$ is perforated for the escape of the hot water into the mine. The wall of strainer $D''$ is perforated, so as to let in the melted sulphur, but to keep out any solid particles. * * * The water from the pipe $A$ * * * flows around the walls of the mine-cavity and fuses the sulfur in said walls, which sulfur flows to the bottom of said cavity and forms a pool around the strainer $D''$ and lower end of the sulphur pipe $E$."

Strainers were old and well known, but had never been applied to apparatus used in the mining of sulphur. The strainer in question is

of undoubted utility and enters into the patented combination and so co-acts with other elements therein as to be patentable, I think, as part of the whole.

[4] The claims in issue of the third patent in suit are, I think, devoid of patentable novelty. Perforated linings had for many years been used in deep wells, such as salt wells, oil wells and water wells. Their function was the same as that of the perforated lining of the third patent in suit, namely, the protection of the well against the falling in of the natural walls, and the facilitation of the passage of water or other liquid through the perforations, their number and size being adjusted to the exigencies of the case. The perforated lining ·of the third patent in suit is a mere addition to the other elements of the combination covered by it, serving only to accomplish the usual purpose of perforated linings, and involved no change in the function or operation of the other elements in the· combination. The other elements in combination were covered by the first two patents in suit. That water escapes and is distributed through the perforations of the lining, and that its discharge through such perforations may be varied through the choking of some of them by material falling from the walls of the well, are purely incidental to the use of the perforated lining in a deep well whether used in the recovery of salt or of sulphur. The new use of the old device in connection with sulphur instead of salt, oil or other liquid, did not confer patentability. It is admitted that the perforated lining of the third patent in suit is useful; but it lacks patentable novelty, whether separately considered or as employed in the combination of that patent.

It is contended by the defendant that claims 2, 6, 19 and 22 of the first patent in suit, and claims 2, 3 and 11 of the second patent in suit, relating to forcing water through the walls of the mine cavity, are void by reason of two years prior public use. The date of the original application, on the division of which the first two patents in suit were granted, was May 27, 1897. The application was divided November 23, 1903, and on the same day the application, either in its original form or as divided, was amended by the addition of claims ·including those which became claims 2, 6, 19 and 22 of the first patent· in suit, and of claims including those which became claims 2, 3 and 11 of the second patent in suit. It clearly appears that the subject matter of the above specified claims with respect to both process and apparatus was within the scope of the invention disclosed in the original application. The drawings accompanying that application were precisely the same in all respects as the drawings in those two patents. In the description contained in the application it appears that hot water under high pressure was forced down through the pipe or casing A, and through the drill well surrounding the interior piping of the mine; that it was also forced down through the pipe D to the bottom of the well in such manner as to be brought in contact with and fuse the sulphur deposit in connection with the hot water forced down through the casing A and the drilled well beneath; that the water so forced down and under high pressure was brought in contact with the walls of the sulphur cavity; and that as a necessary consequence the

hot water would be forced through the walls of the mine cavity in so far as cracks, fissures or porosity would permit, thus forcing back the subterranean cold water and preventing it from interfering with the proper fusion of the sulphur. The patent examiner rejected the proposed amendment so far as pertinent to the claims above specified on the ground that it contained "new matter and to that extent changes the identity of the invention." In answer to the objection made by the examiner Frasch's attorney well said:

"The original description, therefore, expressly recognizes that fusion water can flow away underground; it expressly describes operations and effects which would not occur unless the fusion water should flow away underground; and in actual working in a deposit of the specified character with the apparatus shown according to the directions of the original description of the fusion has and always will flow away underground."

This contention proved persuasive to the examiner, for January 21, 1905, he reversed his decision that it was proposed to introduce new matter, saying:

"This case has been further considered as amended and argued November 26, 1904. In view of the argument bearing on the question of the introduction of new matter by amendment of Nov. 23, 1903, the objection is withdrawn," etc.

[5-7] I am satisfied that the action of the patent office in allowing the amendment was proper. Such allowance was the normal exercise of authority by that office more adequately to secure to the inventor the benefit of his invention. This case is not complicated, if that were possible, by any assertion on the part of third persons that after the filing of the original application and prior to the amendment they had invented the subject-matter of the amendment. The amendment relates back to the time of the filing of the original application, and in order that the claims may be defeated by reason of two years prior public use that use must have extended over a period of at least two years before May 27, 1897. The evidence, however, does not disclose such prior public use. Whatever use Frasch made of the inventions of the first two patents in suit two years or more before the date of the application was experimental, and, as stated by Walker, "Experimental use is never public use within the meaning of the statute, if it is conducted in good faith for the purpose of testing the qualities of the invention, and for no other purpose not naturally incidental to that" (Walker on Pat. § 95).

In the answer it is alleged on information and belief that the patents in suit "are null and void because, while the respective applications for said letters patent were pending in the patent office, and after said alleged applications were filed, the said Frasch and the plaintiff were guilty of laches in prosecuting the same and abandoned the said alleged applications and the alleged inventions thereof and of each of said letters patent, and dedicated the same to the public." This statement is not borne out by the evidence. And further, it appears from the briefs of argument on the part of the defendant that with respect to whatever delays there were in the prosecution in the pat-

ent office of the applications Frasch was within his rights, and the plaintiff in no wise guilty of laches.

[8] Since the organization of the defendant in September, 1913, and prior to December, 1914, twenty-five wells were sunk and operated on the premises now occupied by the Freeport Sulphur Company at Bryan Mound, Texas, and since that date and prior to the institution of this suit certain other wells for the same purpose exemplified by wells 143 and 146, and alike in all particulars, were also sunk and operated on those premises. The question for determination at this stage is whether or not the apparatus used in connection with the operation of the wells above referred to and the process carried on by means of it were not infringements of the first two patents in suit. All of the wells referred to were equipped with pipes corresponding to all of the pipes hereinbefore mentioned in the wells operated by the plaintiff under and in accordance with the patents in suit, and the process of mining sulphur by means of the above mentioned wells at Bryan Mound was, unless for certain alleged differences hereinafter discussed, the same as the process conducted by the plaintiff. It is, however, contended by the defendant that the apparatus and process there employed were the apparatus and process of the expired Frasch patents which, on their expiration, became free to the world. If the apparatus and process employed at Bryan Mound were the apparatus and process of the old Frasch patents, and nothing more, the charge of infringement could not be sustained. But if such apparatus and process at Bryan Mound be the apparatus and process employed by the plaintiff under the patents in suit, the charge of infringement cannot be avoided by some additional apparatus or operation necessitated by the difference between the formations containing the sulphur respectively at Bryan Mound and on the premises of the plaintiff, so long as such additional apparatus and operation do not change the nature or elements of the combination process under the patents in suit or the apparatus thereunder for the conduct of such process, but are resorted to merely for the purpose of enabling the apparatus and process of the patents in suit to be used with effect. There is much evidence tending to show that the deposit of sulphur at Bryan Mound is enclosed in a practically water-tight formation, and hence that for the mining of the sulphur it is necessary to provide a vent for the escape of water from the mine. And it is contended by the defendant that as the sulphur formation at Bryan Mound "is tight, and any water admitted into the mine must return to the surface," bleed wells extending from the surface of the ground into the sulphur deposit are provided for the purpose of performing the same function as the pipe T of figure IV of the expired patents. To this end bleed wells at a greater or less distance from the sulphur wells are provided at Bryan Mound, there being in the sulphur deposit cracks, fissures or channels permitting the water pumped down into the mine to become diffused in such manner as to reach and be forced up through such bleed wells. The existence of these vents renders it possible for the hot water pumped or forced down the sulphur wells to pass through the walls of the mine cavity and force back the cold water in the sulphur deposit

as contemplated in the patents in suit. The evidence is to the effect that the plaintiff's sulphur formation, unlike that of Bryan Mound, is of an open as distinguished from a closed nature, not requiring the existence of bleed wells in order to permit the hot water passing down into the sulphur mine to escape through and force cold water back from the walls of the mine cavity. And the statement is made by counsel for the defendant:

"That difference between a closed formation, where there is no influx of water and no outflux of water, except coming up to the surface of the ground, and an open formation where there is both an influx and an outflux of water (as almost a subterranean river) makes the difference between the methods of operation of the defendant and the complainant, to a very large extent, and makes the difference between the operation of the defendant and the operation under the patents in suit, which patents in suit were taken out expressly in view of an open formation, of the open formation which they found there at Sulphur."

The expired Frasch patents proceeded on the erroneous theory that the sulphur deposit was not porous and water laden; that it was necessary that the hot water pumped down into the sulphur well should return to the surface; and, therefore, that a vent or bleed well should be provided for that purpose. Frasch, prior to the patents in suit, having discovered the erroneous nature of the above theory, did not include in them any provision for bleed wells; but, on the contrary, stated, in the second patent in suit, that "no provision is made for the return of hot water from the mine-cavity to the surface of the ground; but the same is forced out through the walls of said cavity and flows away through the surrounding rock." The operation of bleed wells in a closed or water-tight formation is practically, for the purposes of this suit, to convert the sulphur deposit into a porous, water laden bed. The defendant's expert Waterman says:

"The evidence shows that if the term 'mine cavity' is to be applied to the conditions existing at Freeport, that cavity consists of the net work of crevices and fissures interconnected throughout the sulphur-bearing strata. Into this cavity the Freeport Sulphur Company inserts its producing well and from this cavity it takes the mine water by bleed wells (T, Fig. IV., patent 461,430), this water being forced out of the bleed wells by pumping pressure applied to the producing wells. Of course, no one knows precisely what is found hundreds of feet underground, but that the rock structure consists of a system of cracks and crevices extending through the sulphur-bearing strata is conclusively shown by the facts disclosed in the testimony."

It is, I think, clear to a demonstration that if the apparatus and process used at Bryan Mound were employed in the mining of sulphur in an open formation like that of the plaintiff and, as so employed, either with or without the use of bleed wells, would infringe the process and apparatus of the patents in suit, they would, as used at Bryan Mound only in connection with bleed wells, equally infringe the process and apparatus of the patents in suit. Bleed wells are sunk at Bryan Mound for the purpose of tapping the water in the sulphur deposit; otherwise there would be no reason for their existence. And in fact water from the sulphur formation passes up through these vents and escapes. It is wholly immaterial whether the sulphur deposit at Bryan Mound was or was not originally water laden. If not orig-

inally water laden, it necessarily became so through the provision of bleed wells and the continued forcing of the water down the sulphur wells, as the water so forced down could only reach the bleed wells through the porosity of the sulphur rock or deposit. The hot water forced down the sulphur wells and passing through the interstices or connecting fissures of the sulphur formation would necessarily become cooled in its passage, whereby comparatively cold water would surround the bottom of the sulphur wells, creating a situation whereby the apparatus and process of the first two patents in suit are necessary in order to drive the cold water from close proximity to the sulphur wells. The defendant, however, contends that while in the plaintiff's sulphur bed the mine cavity is produced by the action of hot water upon the sulphur and is represented by a space left in the sulphur deposit after the melting of sulphur therein by the action of the hot water, the mine cavity at Bryan Mound is represented by numerous crevices or fissures interconnected and extending throughout the sulphur bed, the whole constituting the cavity through which the water circulates, which finally escapes through bleed wells, and it is argued that the process of forcing water through the walls of the mine cavity and driving the cold water back as contemplated in the patents in suit is inapplicable to the formation at Bryan Mound. But the distinction drawn sacrifices substance to shadow, and confounds mere words with things. Hot water of the required temperature is pumped down the sulphur wells at Bryan Mound, and that hot water passing into the cracks and fissures drives back the cold water so as to permit the proper melting of the sulphur. Whatever may be the form or character of the surface of the sulphur rock or bed through the cracks or fissures of which hot water is forced at Bryan Mound, it corresponds to and must be treated as the walls of the cavity formed by the melting of the sulphur in proximity to any given sulphur well. The defendant's definition of what constitutes the cavity at Bryan Mound has no practical significance, and tends only to confuse and mislead. The position that the process conducted at Bryan Mound does not infringe because it is necessary to its operation, in view of the structural character of the formation to afford an artificial escape for the surplus of water pumped down into a closed or tight formation, is palpably unsound; for on the defendant's own showing the opening of bleed wells is only a resort to means by which those carrying on operations at Bryan Mound may successfully employ the apparatus and process of the plaintiff (assuming that aside from the necessity for bleed wells there would be infringement), with respect to the driving back of the cold water in the sulphur deposit by means of the forcing of a sufficient quantity of hot water of the required temperature down the well and through the walls of the cavity. If the defendant be right in its theory of a closed and water-tight formation from which sulphur cannot be mined at Bryan Mound without resorting to bleed wells, it may be the misfortune of those carrying on operations there, but it cannot serve as a justification for a resort by them to such wells as the means whereby they may be enabled to secure the forcing into the mine of a sufficient amount of hot water to drive the cold

water back and infringe the patents in suit. It is to be noted in passing that the patents in suit do not state or indicate how far the hot water pumped into the well is to penetrate or pass through the walls of the cavity so long as it is forced so far through the walls as to drive the cold water back and prevent its interference with the conduct of the process.

[9] Having reached the conclusion that the employment of bleed wells at Bryan Mound cannot of itself differentiate the apparatus and process there employed from the apparatus and process employed by the plaintiff the discussion of infringement is much simplified. It appears from the evidence that the sinking of wells at Bryan Mound began in April, 1912, at the instance of certain persons who subsequently secured the incorporation of the Freeport Sulphur Company and the defendant, and that the work thus commenced was done in contemplation of the incorporation of those two companies. E. F. Simms, who had become the owner of or acquired options for land including Bryan Mound, entered November 30, 1911, into a contract with S. M. Swenson & Sons (of which firm Eric P. Swenson was a member, who was at the time of the commission of the alleged acts of infringement and now is the president of both the defendant and the Freeport Sulphur Company), whereby, for the considerations therein mentioned, he agreed to sell to that firm certain tracts of land including Bryan Mound. The contract contained, among others, the following provision:

"As a further consideration for this contract and the performance thereof by said Simms, said Swenson & Sons agree that they, their heirs, executors, administrators or assigns, shall within one (1) year from June 1st, 1912, erect or cause to be erected and put in operation upon the land mentioned and described * * * a complete plant consisting of one unit in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patents."

At the time of the execution of this contract the business of the plaintiff in conducting operations under the patents in suit was a demonstrated success and had attained vast proportions. S. M. Swenson & Sons were among the persons who secured the incorporation of the Freeport Sulphur Company and the defendant, the former becoming incorporated in July, 1912, and the latter in September, 1913. Sulphur mining operations at Bryan Mound have been carried on continuously from April, 1912, to the present time. There has been much controversy as to the significance of the above-quoted portion of the contract of November 30, 1911, as bearing on the question of infringement; the plaintiff contending that the provision for the erection and operation of a plant "in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patents" contemplated the employment of the apparatus and process of those expired patents as modified and improved in accordance with the patents in suit, and evidenced an intention to infringe the latter, and the defendant contending that the contract contemplated the employment of the apparatus and process of the expired patents without any modification or improvement not open to the world. Prior to

application for the patents in suit the apparatus and process of the expired patents as employed on the premises of the plaintiff became a demonstrated failure so far as commercial success is concerned. No evidence has been adduced that the apparatus and process of the expired patents were or could be used with success at Bryan Mound without modification and improvement. Without change such apparatus and process could not be used at Bryan Mound with any greater effect than they were on the plaintiff's premises, and must equally have resulted in failure. This is apparent from what has hereinbefore been stated and requires no further discussion. Hence, it is but reasonable to conclude that the provision in the contract for the installation of a plant "in accordance with the process operated at the Union Sulphur Works in Louisiana, under the expired Frasch patents" contemplated an employment of the original Frasch apparatus and process as changed by some modification or improvement. In providing for the installation of a plant in accordance with the process operated by the plaintiff "under the expired Frasch patents" the dominant idea was that the process to be conducted in the plant should accord with the process employed by the plaintiff at the date of the contract. Any other conclusion, I think, would involve an absurdity. But notwithstanding the fact that the apparatus and process of the expired patents had fallen short of attaining commercial success, they covered the broad conception of melting sulphur deep in the earth and raising it in a melted condition to the surface, and were not nullities. An invention may be patentable as possessing utility in the sense of the law, although an improvement may be necessary to its commercial success. Walker on Pat. § 79. Thus, it may be possible that the parties to the contract in requiring the plant to accord with the process "under the expired Frasch patents," may have had in mind that process as modified and improved under the patents in suit. If that was in contemplation they may or may not have intended to violate any monopoly possessed by the plaintiff. If they had such intention they meditated infringement. So, if they believed that the plaintiff was not under the patents in suit possessed of a patent monopoly with respect to any modification or improvement of the original apparatus and process of the expired patents, but nevertheless intended to perform or secure the performance of acts which without their knowledge or any wrongful intent on their part would in fact violate the monopoly, they must, aside from any question of the measure of damages, be treated in the same manner as if actually intending to infringe. Walker on Pat. § 377.

The conduct of operations at Bryan Mound has been attended with marked success. They were not commenced until long after the failure of the apparatus and process of the expired patents as employed at the sulphur bed of the plaintiff. As before stated, such apparatus and process, unless modified and improved, could not be used beneficially at Bryan Mound. In the operations commenced at the latter place ex-employés of the plaintiff were employed who were familiar with the improvements in apparatus and process covered by the patents in suit. The vital inquiry at this stage is as to the character of

the improvements in the apparatus and process of the expired patents which have rendered possible the attainment of such success in mining operations at Bryan Mound, and whether or not they infringe the patents in suit. Absalom Webber, the field manager of the Freeport Sulphur Company, formerly in the employ of the plaintiff as a driller of wells, testified without contradiction with respect to the equipment and operation of the plant at Bryan Mound, as follows:

"XQ. 269. Now, when you first came to Freeport and equipped your first well for the Freeport Sulphur Company, you equipped it in just exactly the same way as you had learned to equip wells for the Union Sulphur Company at Sulphur, Louisiana, did you not? A. Practically the same. XQ. 270. And when you came to steaming that well, it was steamed in exactly the same way as you had observed wells being steamed at Sulphur, Louisiana, was it not? A. Practically the same way. XQ. 271. And when you came to pumping that well, you pumped it in just the same way as you had observed wells being pumped at Sulphur, Louisiana, did you not? A. Practically the same way. XQ. 272. And with the exception of the unsuccessful variation that you made in some wells, you equipped all the wells up to 143 in the same way that you equipped well 103, did you not? A. With the exception just stated that I don't remember having used a closure between the eight-inch perforated liner and the five-inch pipe, in all wells, that is, speaking of wells prior to 143. XQ. 273. And when you steamed these twenty-nine wells that you steamed prior to well 143, you steamed them in the same way that you steamed well 103, did you not? A. With the exception of many experiments I made, which are so numerous I don't remember them. XQ. 274. And when you pumped these twenty-nine wells, with the exception of the fact that you varied the quantity of the water supply in the six-inch pipe in the well during pumping operations, you pumped them in the same way that you pumped well 103, did you not? A. In the same general way, except to vary the quantity of compressed air in many instances."

The witness further testified:

"RDQ. 519. * * * Will you please give a list of the principal changes which you made in both equipment and method of operation between the time you experimented with well 103 and produced successful operation with well 143? A. (1) I discontinued the use of the seat in the 8-inch liner; (2) I opened wells to allow the escape of water from the formation; (3) I forced the water in with booster pumps instead of allowing it to flow in by pressure; (4) I discontinued the use of the 14-inch casing; and (5) I discontinued the use of pumping water to the bottom of the well while pumping sulphur."

The first change made by discontinuing the use of the seat in the 8-inch liner is not pertinent to the consideration of this case. The second change relates to bleed wells, which have already been considered. The third change relating to the forcing of hot water down the sulphur wells by booster pumps instead of allowing it to flow down by pressure is immaterial for the purposes of this suit. It effected no change in the apparatus or process of the well beneath the surface of the ground. The fourth change was the discontinuance of a 14-inch casing, which is wholly foreign to the issues here involved. The fifth change was the alleged discontinuance of the practice of pumping water to the bottom of the well during the pumping of the melted sulphur.

The defendant contends that on the assumption that the air-lift employed by the plaintiff in combination with the other elements of the apparatus was patentable, the air-lift used in the mining operations at

Bryan Mound does not infringe the patents in suit for the reason that while the plaintiff's air-lift is constituted by forcing air into the melted sulphur near the lower end of the sulphur pipe, aerating the sulphur and reducing the specific gravity of the contents of that pipe below that of water, the air-lift at Bryan Mound is constituted by introducing air into the sulphur pipe near its lower end in such manner that instead of the production of aeration the air forms bubbles in the sulphur pipe with a piston-like function, layers of melted sulphur alternating with layers of air contained in those bubbles, as a result of which the contents in the sulphur pipe will rise toward the surface of the ground. But this is nothing more than reducing the specific gravity of the contents of the sulphur pipe below that of water, and performing the same function as the aeration of the melted sulphur by the plaintiff. Conceivably the air-lift employed at Bryan Mound may be an improvement on that of the plaintiff, but the patents in suit covering specifically the air-lift as one of the elements in the patented combination, no air-lift in connection with sulphur mining having theretofore been used, the air-lift used at Bryan Mound cannot be substituted for the former without infringement.

Another contention of the defendant is that the double delivery of hot water of the patents in suit is not to be found in the process employed at Bryan Mound. The apparatus there employed contains piping similar to that of the plaintiff, and provides the means by which simultaneous double delivery of top and bottom water may be effected, and in point of fact simultaneous double delivery is effected in "steaming" the well, and during that process by means of the double delivery sufficient hot water is pumped into the well to melt the sulphur until it forms a pool rising high enough to seal the bottom of the sulphur pipe. When the sulphur pipe is so sealed and the air-lift begins or is about to begin to operate, the bottom water is shut off by means of a stop-cock, while the top water continues to be forced down and to melt the sulphur. Whenever by reason of the insufficiency of the top water alone to melt the sulphur to such an extent as to maintain the surface of the sulphur pool sufficiently high to seal the sulphur pipe and that pipe begins to "blow," the stop-cock on the bottom water pipe is turned on and both bottom and top water are forced down in order to insure the efficient and sufficient melting of the sulphur. The witness Webber testifies:

"RDQ. 518. In answer to XQ. 375 you state that you never take the hot water off the 4-inch line from the plant; why do you keep the hot water circulating in that line during the time you are not using it in the well? A. We want to keep the pipes hot to prevent the expansion and contraction along the line and to have hot water available in that line for use at short notice."

The witness Austin testified to the same effect. The apparatus at Bryan Mound will permit the operation of the air-lift during the simultaneous forcing of bottom and top water down the well provided the lower end of the sulphur pipe is sealed by sulphur, but it is not the practice, so long as enough top water is forced down to insure the melting of sufficient sulphur to permit the air-lift to operate, to turn on and force down bottom water. Whether the disuse of the bottom

water be prompted by motives of economy or for the purpose of avoiding the formation of granular sulphur products is immaterial, for the fact remains that the simultaneous delivery of both top and bottom water is practiced in so far as necessary to the efficient and sufficient melting of the sulphur. Whether or not the process as conducted at Bryan Mound is an improvement upon the process of the plaintiff with respect to the delivery of hot water at the bottom of the mine is immaterial. A purpose for the accomplishment of which the apparatus and process both of the plaintiff and of those conducting operations at Bryan Mound were designed was the forcing down into the mine of sufficient hot water to secure the desired result—a result secured by the plaintiff through a normal simultaneous delivery of top and bottom water, and at Bryan Mound by a simultaneous delivery of top and bottom water whenever necessary to secure that result. With respect to this feature of the apparatus and process of the patents in suit there is clear infringement.

[10] The claims in issue of the first and second patents in suit are, as before stated, Nos. 2, 3, 6, 12, 19, 21 and 22 of patent 799,642, and Nos. 2, 3, 7, 11, 21 and 24 of patent 800,127. Claim 21 of the last named patent relates to the strainer. For reasons already given this claim must be sustained and held to have been infringed. All the rest of the claims in issue under the first and second patents in suit relate to the air-lift, the double delivery of hot water, and the forcing of hot water through the walls of the mine cavity. It is unnecessary to discuss them in detail. For the reasons already given I think they are valid and have been infringed.

The defendant contends that on the issue of infringement the plaintiff must be restricted to the apparatus used and the process employed in connection with defendant's wells 143 and 146 at Bryan Mound or to apparatus and process similar to those used and employed in those wells. The bill alleged generally that the defendant and the Freeport Sulphur Company wrongfully and without license or consent of the plaintiff manufactured and used the apparatus and process embodying the inventions set forth in the patents in suit in mining sulphur, without any enumeration or specification of the wells in which such infringement occurred. Rule 20 of the rules prescribed by the Supreme Court (198 Fed. xxiv, 115 C. C. A. xxiv) provides that "a further and better statement of the nature of the claim or defense, or further and better particulars of any matter stated in any pleading, may in any case be ordered, upon such terms, as to costs and otherwise, as may be just." The defendant shortly after the filing of the bill gave notice to the plaintiff that it would apply to this court May 15, 1915, for an order requiring the plaintiff to furnish to the defendant a bill of particulars and better statement of the plaintiff's claim, setting forth and specifying, among other things:

"The character of the apparatus, devices and appliances, or the particular apparatus, devices or appliances which plaintiff claims that the defendant, Freeport Texas Company, has manufactured, used or operated, or conspired to manufacture, use or operate, or authorized or directed to be used, manufactured or operated, within six years last past, in the mining of sulphur and in infringement of or embodying the alleged inventions of any of said claims of

any of the patents in suit, as alleged in the 9th, 10th and 12th paragraphs of the bill, and which apparatus, devices or appliances the plaintiff intends to rely upon at the trial of this suit as evidence of such alleged infringement," etc.

Prior to the day designated in the above notice for the making of application to the court for a bill of particulars and better statement of plaintiff's claim, the latter voluntarily and without any order of court, furnished to the defendant a bill of particulars, which, among other things, contained the following:

"3. The character of the apparatus and devices alleged to infringe in the 9th, 10th and 12th paragraphs of the complaint is exemplified by mines and appurtenances such as defendants' wells 143 and 146 and their appurtenances, situated on Bryan Heights at Freeport, Texas.

"4. The character of the processes alleged to infringe in the 9th, 10th and 12th paragraphs of the bill of complaint is exemplified by the processes used in the operation of such mines as defendants' wells 143 and 146, aforesaid."

[11] The bill of particulars further set forth that "these particulars are given without waiving the plaintiff's right to rely, in this or other suits, upon any infringing acts of these defendants or either of them," etc. No exception or objection appears to have been made or taken to this reservation in the bill of particulars; nor did the defendant demand any further bill of particulars. Rule 20 contemplates the making of an order by the court for a further statement of the nature of the claim or further and better particulars. This court has not taken nor has it been asked to take any action with respect to the filing of a bill of particulars or further statement. The bill of particulars was, as before stated, voluntarily furnished, and has not been objected to. The reservation in the bill of particulars means something or nothing. It reserves the right of the plaintiff to complain of "any infringing acts." It cannot be assumed that it was intended to have no effect; and, if any effect is to be given to it, it must be to reserve to the plaintiff the right to complain of infringing apparatus and process other than those exemplified by the apparatus and process used and employed in connection with wells 143 and 146. And this appears to have been the practical interpretation given to the reservation by the parties during the taking of the testimony. Evidence was adduced not only by the plaintiff but by the defendant touching other wells antedating wells 143 and 146 without objection on either side. It is true that toward the close of the testimony on the part of the defendant objection was made by it to the consideration on the issue of infringement of apparatus or process in wells other than 143 and 146, as being excluded by the bill of particulars. This objection followed a statement on the part of the plaintiff as follows:

"That there may be no doubt as to plaintiff's position in regard to infringement under the statements of its bill of particulars, plaintiff gives notice that it will rely upon the equipment and processes used in connection with the twenty-five wells which the witness Webber testified were equipped similar to well 103 and similarly operated after the formation of the defendant company, as well as on the equipment and operation of wells 143 and 146, and all similarly equipped and operated wells, if there is in the defendant's mind any distinction, which is relevant, between the operations used in wells 143 and 146 and the wells of the type of 103."

[12] Under the circumstances the position taken by the defendant that on the question of infringement the plaintiff must be restricted to wells 143 and 146 cannot be sustained. Further, in view of the fact that the infringer is chargeable with knowledge of the infringing acts, this conclusion cannot be viewed as subjecting the defendant to any hardship or undue burden. The extent and particulars of infringement are thus left open for the master's action.

[13, 14] There has been much controversy on the question whether the defendant is responsible for whatever acts of infringement of the patents in suit, or any of them, were committed at Bryan Mound. The bill alleges that the defendant and the Freeport Sulphur Company "conspired and contrived together" to use the inventions embodied in the patents in suit; that "conspiring together, and acting in concert," they wrongfully used the apparatus and processes embodying the said inventions; and that the defendant has "committed such acts of infringement in that it has authorized, directed and controlled" the infringing acts of the Freeport Sulphur Company. The evidence proves, I think, beyond all reasonable doubt the existence of responsibility on the part of the defendant for such infringing acts. At the time of their commission the officers of the defendant were the officers of the Freeport Sulphur Company; a majority of the board of directors of the latter company constituted a majority of the defendant's board; and practically all of the stock of the Freeport Sulphur Company was owned by the defendant. This community as to officers, directors and stock of the two companies would not of itself be sufficient to render the defendant liable for acts of infringement committed on the premises occupied by the Freeport Sulphur Company. The law is authoritatively settled on this point. But the responsibility of the defendant rests upon a wider and firmer basis than such community of officers, directors and stock. The evidence, direct and circumstantial, conclusively shows knowledge on the part of the defendant of the infringing acts committed on the premises in question without any repudiation of them by the defendant, and also active procurement by it of and participation by it in such infringing acts. While the evidence does not disclose actual knowledge on the part of the defendant of everything that was done in connection with the construction and operation of the sulphur wells on the premises, it does show beyond all peradventure that it procured for and furnished to those premises apparatus and devices with the understanding and intention on its part that the same should be used in the construction and operation of such wells in violation of the rights of the plaintiff under the patents in suit with respect both to process and apparatus.

[15, 16] The doctrine of agency applies to patent infringements, and also the principle that one doing an act which naturally causes another to commit an infringement is responsible for it; and further, that where several persons co-operate in acts of infringement they are joint tort feasors and as such jointly and severally liable in solido. It is wholly immaterial whether the cost of such apparatus and devices was or was not ultimately paid by the Freeport Sulphur Company. The circumstance that another person pays the cost of infringement can

never serve as a justification to the infringer. Nor can the fact that such other person is a joint infringer serve to protect the former. The evidence wholly fails to disclose any repudiation, disavowal or disclaimer on the part of the defendant of all or any infringing acts committed at Bryan Mound. On the contrary it appears that Westinghouse, Church, Kerr & Co., engineers and constructors, were employed by the defendant, and in that capacity furnished and constructed the plants in which the acts of infringement were committed. Under these circumstances the question of technical control by the defendant of the Freeport Sulphur Company, or of technical conspiracy between the two companies, becomes unimportant, as the infringing acts were in contemplation of law committed by the defendant.

At the conclusion of the plaintiff's prima facie case the defendant moved that the bill be dismissed on the following grounds:

"First. That the plaintiff's evidence fails to establish or show a prima facie or any cause of action against the defendant.

"Second. That assuming the plaintiff's evidence to be beyond dispute, it does not establish any use or infringement by this defendant or any one of any of the alleged inventions of any of the claims in issue of any of the patents in suit.

"Third. That assuming that the plaintiff's evidence establishes a use or infringement of any of the claims in issue of any of the patents in suit, such evidence does not establish that such use was made or infringement committed by this defendant, or that it is liable therefor, or had any legal control over the acts constituting such alleged use or infringement."

At the time of making the motion the defendant gave to the plaintiff notice as follows:

"That this motion will be urged at the hearing and at such other time or times as may be proper; that defendant will object to any attempt hereafter made by the plaintiff, on rebuttal or otherwise, to cure the defects or supply the insufficiencies of its opening evidence herein, and that any evidence of the defendant hereinafter taken by the defendant will be introduced without waiving and without prejudice to the foregoing motion to dismiss."

[17] Accordingly the defendant has insisted that the bill be dismissed. It is unnecessary to discuss the third ground of the motion in view of the fact that the court has already found that the defendant and the Freeport Sulphur Company are joint tort feasors with respect to the infringement of the patents in suit; each of them being liable for acts of infringement by the other. The second ground of the motion is in effect that there has been a failure by the plaintiff to establish infringement by any person of any of the patents in suit. It is unnecessary to discuss this ground, for the reason that the court has found to the contrary. The first ground, while general in its nature, appears from the argument of counsel to have been based substantially upon the failure of the plaintiff in making its prima facie case to produce and examine any patent expert witness as to the meaning and construction of the claims in issue of the several patents in suit. As it rests with the court and not with experts to decide this case, the objection taken is one essentially addressed to its discretion. If the evidence be of such a character that the court feels that it is able to render an intelligent and just decision without the assistance of patent

experts I know of no principle of law or of common sense restraining the court from discharging its proper functions without requiring what it deems unnecessary. There may be exceptional cases involving such scientific or abstruse problems as to require a court for an enlightened exercise of its functions to have the benefit of witnesses technically known as patent experts, but the law regards substance and not shadow; and where witnesses from their experience and observation are competent to give an intelligent and adequate opinion and explanation of patented process or apparatus their testimony is not to be rejected because they are not labeled experts or hold degrees from institutions of learning. The professional expert is only too often the thick and thin advocate of the party employing him, whose chief aim is to win the case for his client, and in doing so oftentimes to befog it for his adversaries by resorting to technicalities and hairspun distinctions. Of course, there are many professional experts not justly subject to this criticism, but as a general rule greater dependence should be placed upon intelligent witnesses, not professionally employed, who from their practical knowledge and experience are competent to testify as to the nature and practice of patented inventions and who are free from suspicion as to the fairness of their opinions. In Hardinge Conical Mill Co. v. Abbe Engineering Co., 195 Fed. 936, 939, 115 C. C. A. 624, 627, where a motion to dismiss a bill in a patent cause for the failure on the part of the plaintiff to produce a patent expert in making its prima facie case had been denied, Judge Lacombe, in delivering the opinion of the circuit court of appeals for the second circuit, affirming the action of the court below, said:

"Its [the defendant's] contention here is that the patent is a puzzling one difficult to comprehend, and that an expert should have been called to show just what is the structure, mode of action, and result of the patented apparatus and also of defendant's; that in no other way could it be made to appear that there is such identity of structure and function as would sustain a finding of infringement. We do not agree with defendant's counsel. We find nothing difficult, intricate, or puzzling about the specifications, the drawings, or the single claim, on which complainant relies. Possibly an expert, if allowed to talk long enough, might have made them seem puzzling by the use of a multitude of words, and the reading into the description of propositions emanating from the expert's own brain, unsuggested by anything in the specifications."

The plaintiff introduced in its prima facie case a large volume of competent and convincing evidence as to the nature and operation of the apparatus and process of the patents in suit. Under these circumstances, the first ground of the motion to dismiss the bill is, I think, wholly destitute of merit, and the motion must accordingly be denied.

For the reasons above given the bill must be sustained as to claims Nos. 2, 3, 6, 12, 19, 21 and 22 of patent 799,642, and claims Nos. 2, 3, 7, 11, 21 and 24 of patent 800,127, but must be dismissed as to patent 1,008,319. A decree in accordance with this opinion may be prepared and submitted.