## NATIONAL LABOR RELATIONS BOARD *v.* DEENA ARTWARE, INC., ET AL.

No. 46.  Argued December 8, 1959.—
Decided February 23, 1960.

*Ralph S. Spritzer* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Stuart Rothman, Thomas J. McDermott* and *Dominick L. Manoli.*

*James G. Wheeler* argued the cause for respondents. With him on the brief were *Mervin N. Bachman, Thomas J. Marshall, Jr.* and *Sidney R. Zatz.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This litigation has been long and drawn out and the present case is merely a small segment of it. In 1949 petitioner found that respondent Deena Artware, Inc. (Artware), had violated the National Labor Relations Act, 61 Stat. 136, 29 U. S. C. § 158 (a), by discharging and refusing to reinstate 66 employees who had engaged in a strike (86 N. L. R. B. 732, 95 N. L. R. B. 9); and it ordered Artware "and its officers, agents, successors, and assigns" to offer reinstatement to those employees and to make them whole for any loss of pay suffered by them as a result of the discriminating action. The Court of Appeals in 1952 affirmed the Board's decision with respect to 62 of the 66 employees and entered a decree enforcing the Board's order, 198 F. 2d 645, remanding the case to the Board to determine the amounts due the individual employees. In 1953 Artware offered reinstatement to all of these employees but shortly closed its plant (which was located in Kentucky), never resumed operations, and never paid any back pay to the employees in question.

It appears that Weiner, one of the respondents, created a series of corporations, at the top of which was Deena Products, Inc. (Products), an Illinois corporation. Beneath it was a group of subsidiaries—formed under Kentucky law—Artware, Deena of Arlington, Inc., Sippi Products Co., Inc., and Industrial Realty Co., Inc.—all of whose shares, except for qualifying shares, were owned

by Products. Weiner owned all the shares of Products, except for qualifying shares; and all the officers and directors of Products and the several subsidiaries were Weiner, his wife, his son, and his secretary. Weiner was president and treasurer of Products and of each of the subsidiaries, including Artware.

Artware in 1949 gave Products a promissory note secured by a mortgage on Artware's property, allegedly for advances made. In 1952 Artware made an assignment to Products in partial satisfaction of its indebtedness. In 1953 the Board applied to the Court of Appeals for an order restraining that assignment. It also asked for an order of discovery, alleging that the affairs of Products and Artware were being conducted in such a way as to dissipate Artware's assets and to avoid making the back wage payments. The court denied these motions, holding that, until the amount of back pay was liquidated and payment of the fixed sum refused, there was no warrant for granting that relief (207 F. 2d 798), the court adding that if upon liquidation of Artware "any financial inability" on its part to pay the awards was shown to be "the result of improper actions on its part in the meantime, appropriate contempt action can then be taken." *Id.,* at 802.

At that time, the Board had not issued an order determining the specific amounts of back pay owed the individual employees. In 1955—nearly two years later—it made that determination and entered an order, directing payment of back pay totaling about $300,000; and the Court of Appeals ordered Artware, "its officers, agents, successors and assigns" to pay that amount to specified employees. 228 F. 2d 871. That was on December 16, 1955.

In 1957 the Board moved the Court of Appeals for discovery, inspection, and depositions, naming Artware, Weiner, Products, and the other subsidiaries of Products.

It alleged that Weiner had caused the assets of Artware to be siphoned off through the other corporations under his control for the purpose of evading the back pay obligation. The Court of Appeals denied the motion, 251 F. 2d 183, holding that a contempt proceeding, rather than discovery, was the proper procedure.

On August 20, 1958, the Board petitioned the Court of Appeals to hold Artware, Weiner, Products and the other subsidiaries in civil contempt for failure to pay the amounts due employees under the back pay order. On October 11, 1958, the Board renewed its motion for discovery, inspection, and the taking of depositions from Artware, the affiliated corporations, and Weiner and other officers of these corporations.

In its petition the Board made charges of dealings between these corporations and between them and Weiner occurring from 1949 to 1955 which, it maintained, showed both (1) fraud and wrongdoing for the purpose of frustrating the back pay order and (2) the operation of these various corporations "as a single enterprise," each of the corporations performing "a particular function, as a department or division of the one enterprise in the manufacture, sale and distribution of the common product." The allegations (which are summarized in the opinion below, 261 F. 2d 503, 506–507) need not be repeated here, as the Court of Appeals merely held that, although the enforcement order was entered July 30, 1952, it was not made specific as to amounts owed until December 16, 1955. It, therefore, concluded that prior to the latter date the decree was "not sufficiently definite and mandatory to serve as the basis for contempt proceedings." Id., at 510. It, therefore, dismissed the Board's petition for adjudication in civil contempt. It also denied the Board's motion for discovery, inspection, and depositions. 261 F. 2d 503, 510. The case is here on a petition for certiorari, 359 U. S. 983, which we granted in order to consider the

validity of the action of the Court of Appeals in dismissing the petition insofar as it charged the existence of "a single enterprise."

The Court of Appeals dismissed the petition without considering the second group of allegations made by the Board, *viz.*, that these various corporations were in fact "a single enterprise." And it denied the motion for discovery even as it pertained to that alternative theory of liability. It may have done so because it thought that the issues tendered in the petition related solely to inter-company transactions alleged to be conveyances in fraud of creditors or preferences in favor of some creditors. That seemed to be its preoccupation, as is evident by its references to possible causes of action under Kentucky law to set those transactions aside. *Id.*, at 509.

We do not stop to consider what would be a proper formulation of a rule of law governing liability in contempt for frustration of a decree. The Court of Appeals may have considered the transactions and assignments as if they were made between separate and distinct corporations. If they are viewed in that light, we cannot say they are so colorable as to warrant us in reversing the Court of Appeals. But we think the Board is entitled to show that these separate corporations are not what they appear to be, that in truth they are but divisions or departments of a "single enterprise." That is the alternative theory of liability which the Court of Appeals did not consider. We think that the Board is entitled to a hearing on that alternative theory and to discovery in aid of it.

The question whether the corporations under Weiner's ownership were only departments or divisions in one single enterprise is in a different category than those that arise under either 13 Eliz. or the modern law of preferences. Whether one corporation is liable for the obligations of an affiliate turns on other considerations. The insulation of

a stockholder from the debts and obligations of his corporation is the norm, not the exception. See *Pullman Car Co. v. Missouri Pacific R. Co.*, 115 U. S. 587, 597. Yet as Mr. Justice Cardozo said in *Berkey* v. *Third Avenue R. Co.*, 244 N. Y. 84, 95, 155 N. E. 58, 61, "Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice." That is not a complete catalogue. The several companies may be represented as one.[1] Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities. One company may in fact be operated as a division of another;[2] one may be only a shell, inadequately financed;[3] the affairs of the group may be so intermingled that no distinct corporate lines are maintained.[4] These are some, though by no means all,[5] of the

[1] See *Platt* v. *Bradner Co.*, 131 Wash. 573, 230 P. 633. Cf. *American Nat. Bank* v. *National Wall-Paper Co.*, 77 F. 85, 91.

[2] See *Foard Co.* v. *Maryland*, 219 F. 827, 829; *Portsmouth Cotton Oil Corp.* v. *Fourth Nat. Bank*, 280 F. 879; *Dillard & Coffin Co.* v. *Richmond Cotton Oil Co.*, 140 Tenn. 290, 296, 204 S. W. 758; *Costan* v. *Manila Electric Co.*, 24 F. 2d 383, 384–385. Cf. *United States* v. *Delaware, L. & W. R. Co.*, 238 U. S. 516, 529; *Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic Assn.*, 247 U. S. 490, 500–502; *Erickson* v. *Minnesota & Ontario Power Co.*, 134 Minn. 209, 213–215, 158 N. W. 979, 980–981.

[3] See *Luckenbach S. S. Co.* v. *W. R. Grace & Co.*, 267 F. 676, 681; *Oriental Investment Co.* v. *Barclay*, 25 Tex. Civ. App. 543, 554–557, 64 S. W. 80, 86–87. For discussion of the situation where a company is "deliberately kept judgment-proof" see *Weisser* v. *Mursam Shoe Corp.*, 127 F. 2d 344, 346.

[4] See *The Willem van Driel*, 252 F. 35, 38; *Wichita Falls & N. W. R. Co.* v. *Puckett*, 53 Okla. 463, 502–505, 157 P. 112, 124–125. Cf. *United States* v. *Lehigh Valley R. Co.*, 220 U. S. 257, 272–274.

[5] Cf. *Union Sulphur Co.* v. *Freeport Texas Co.*, 251 F. 634, 661–662; *Harlan Public Service Co.* v. *Eastern Constr. Co.*, 254 Ky. 135, 143, 71 S. W. 2d 24, 29.

relevant considerations, as the authorities recognize. See Lattin on Corporations (1959) ch. 2, §§ 13, 14; Stevens on Corporations (1949) § 17; Berle, The Theory of Enterprise Entity, 47 Col. L. Rev. 343.

We do not intimate an opinion on the merits of this alternative theory of liability. The authorities we have cited merely indicate the range of inquiry which the petition of the Board presented. Discovery is useful in determining what the facts are. It is, indeed, necessary to determine whether the decree of the court enforcing the Board's order should run to any of the affiliated corporations or their stockholders. When the facts are resolved, it will be time enough to consider what further enforcement decree, if any, would be appropriate.[6]

The petition should be reinstated insofar as it charges the existence of "a single enterprise," and the motion for discovery should be granted so that the Board will have an opportunity to prove those allegations.

*Reversed.*

MR. JUSTICE STEWART took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE HARLAN joins, concurring in reversal on the grounds herein stated.

Due regard for the controlling facts in this case will lay bare their legal significance. This requires that the facts, and the procedural setting in which they are to be considered, be stated with particularity.

The respondents are an individual and several corporations. The individual respondent, one Weiner, is the sole stockholder, except for qualifying shares, of Deena Products (Products), an Illinois corporation engaged in the

---

[6] Cf. *Regal Knitwear Co. v. Labor Board*, 324 U. S. 9, 16.

manufacture and sale of lamps. The remaining respondents are wholly owned subsidiaries of Products. They are Deena Artware (Artware), a now defunct Kentucky corporation which formerly engaged in the manufacture of china urns for use as lamp bases; Deena of Arlington, another Kentucky corporation, engaged in the production of shades and the assembly of lamps; Sippi Products Company (Sippi), a Kentucky corporation engaged, as was Artware formerly, in the manufacture of china urns for use as lamp bases; and Industrial Realty Company (Industrial), a Kentucky corporation organized to hold title to the physical assets formerly held by Artware. Weiner has, at all relevant times, completely controlled Products, which in turn has similarly dominated all of the respondent subsidiaries. Weiner served as President, Treasurer[1] and a director of all of the corporations; his wife, son and successive secretaries as the other directors.

Artware was organized by Products in 1946, and shortly thereafter acquired a factory for the production of lamp bases at Paducah, Kentucky. In 1947 construction was undertaken, allegedly by Products, of a lamp assembly plant adjacent to the Artware plant at Paducah. At about the same time the labor dispute arose which led to the Labor Board orders underlying this proceeding. On October 25, 1949, Artware was found by the Board to have violated § 8 (a)(1), (3) and (5) of the National Labor Relations Act (as amended) and was ordered, *inter alia*, to reinstate with back pay sixty-six named employees whose discharge during the dispute was found to have been improper. 86 N. L. R. B. 732, 736. On July 30, 1952, the Court of Appeals for the Sixth Circuit, at the Board's petition, granted enforcement of its order. 198 F. 2d 645. At about the same time that court also

---

[1] The respondents' answer denies that Weiner was in fact Treasurer of Artware or the other subsidiaries.

sustained Artware's recovery against the union of a money judgment for injuries it sustained by virtue of a secondary boycott engaged in by the union during the same dispute. 198 F. 2d 637.

The Board then petitioned the Court of Appeals for an injunction against payment of a part of the judgment Artware had recovered against the union, alleging that Artware had undertaken to render itself unable to pay any back pay in the amounts which the Board was authorized to fix by virtue of the court's order of July 30, 1952. The Court of Appeals refused the injunction primarily upon the ground that the definite amount of back pay owing under its order had not yet been determined by the Board. The court noted that if, after such determination, it appeared that Artware had acted improperly, the court could deal with the matter in contempt proceedings. 207 F. 2d 798.

As a result of the proceedings to fix the amount of back pay, the Board, by an order of April 21, 1955, directed Artware to pay the back pay it owed various employees in specified amounts totaling about $300,000. 112 N. L. R. B. 371. This order was sustained by the Court of Appeals. 228 F. 2d 871. On a showing that Artware was entirely without assets, had ceased operations on April 24, 1953, and had, on November 24, 1954, transferred all its assets to Products, purportedly in satisfaction of a mortgage, the Board sought a discovery order in the Court of Appeals to inquire into the disposition of Artware's assets. The Board proceeded on the assumption that discovery would reveal facts requiring payment of Artware's back-pay debt by the companies affiliated with it. Discovery was denied (one judge dissenting). 251 F. 2d 183. The court's ground for denying discovery was, surprisingly enough, that the Board should first test the legal sufficiency of a complaint charg-

ing respondents with contempt. The Board thereupon filed this petition alleging contempt of the court's decree of enforcement of July 30, 1952, and renewed its motion for discovery.

The Board's petition charged that pursuant to a plan to frustrate the award of back pay against Deena Artware, conceived by Weiner during or shortly after the dispute with the union and carried out by him through exercise of his control of Products and all its subsidiaries, all of the assets of Artware were systematically transferred to Products and its other subsidiaries for the purpose of rendering Artware unable to pay any back-pay order that might thereafter be enforced against it. It alleged that acts in pursuance of that plan occurred after, and therefore in contempt of, the decree of the Court of Appeals which was entered on July 30, 1952. All of the acts alleged in pursuance of the plan occurred before the entry of the 1955 decree affirming the Board's order to pay specific amounts. The Board charged that Weiner and Products prevented Artware from showing any operating profits and thereby from accumulating assets in the ordinary course of its business, by causing Artware to lower the price at which it sold urns to Products, so that Artware showed losses while Products made substantial profits; and that Weiner and Products caused Artware to issue notes, secured by mortgages on all of its assets, to Products, for which Artware received nothing in return, in order that Artware's assets could be, as they were, transferred to Products after Artware was adjudicated liable to pay back pay. The Board alleged the following:

1. Early in 1948, after Artware, under Weiner's direction, had committed the unfair labor practices so found by the Board, Products began to treat the new assembly plant construction at Paducah adjacent to Artware's plant as if it had been undertaken by Artware, and not, as was

the fact, by itself. Artware therefore recorded the losses resulting from abandonment of that construction in July 1948. Nevertheless, when Products undertook alternative new construction at Arlington for the same purpose, it used the construction materials, engineering and architectural plans and services, and other services and materials, which it had already charged to Artware, and did so without paying Artware or crediting it with their value.

2. Products thereafter made further use of its purported shift of the Paducah construction to Deena Artware. About October 31, 1949, a few days after the Board issued its order directing, *inter alia*, that Artware pay back pay, Products and Weiner caused Artware to execute a note to Products in the amount of $75,459.65, payable within five years, and secured by a mortgage on all the real and personal property of Artware, purportedly in return for advances by Products for the construction at Paducah, despite the fact that the construction had been abandoned more than a year before, and had been undertaken not by Artware, but by Products. A second note, similarly secured, was issued about September 19, 1952, in the amount of $5,797.74. On November 24, 1954, after the Court of Appeals' first enforcement order of July 30, 1952, but before the Board's fixation of the amounts due on April 21, 1955, Weiner and Products caused Artware to transfer to Products all of its assets in satisfaction of these mortgages. In December 1952 Products and Weiner also caused Artware to assign to Products part of the proceeds of the judgment Artware had recovered against the union, as additional security for its obligations to Products. In January 1954, $19,320.97 of Artware's recovery was received by Products, the remainder having been assigned to Artware's counsel in payment of attorney's fees.

3. Beginning about March 1949, after the hearing on the Board's complaint against Artware, Products and Weiner caused Artware to lower its prices to Products,

causing inflation of Products' profits, and operating losses to Artware.

4. About April 24, 1953, Products and Weiner caused Artware to cease all operations. From that time until November 24, 1954, Products and Sippi used Artware's plant premises, facilities and properties at Paducah, without payment to Artware, and Products obtained from Sippi the supplies it had formerly secured from Artware. On November 24, 1954, Products and Weiner caused Artware to transfer all its assets to Products in satisfaction of its obligations which then, with accrued interest (at 6% payable semi-annually, but not theretofore paid), totaled $105,000, leaving, as Artware's sole unsatisfied obligation, the back-pay order. Thereafter Sippi continued to use the Artware facilities, title to which, about May 4, 1955, Products caused to be transferred to the newly created subsidiary, Industrial. About November 17, 1955, Products and Weiner caused Industrial to lease the facilities formally to Sippi; and since December 1, 1955, Sippi has operated the Artware facilities in the same manner and to the same end as did Artware formerly.

The Court of Appeals, on respondents' motion, dismissed the complaint for failure to state a cause of action, and denied the Board's accompanying motion for discovery. It held that since its order of July 30, 1952, in affirming the Board's determination of liability for back pay which the Board had not yet individualized, did not specify the exact monetary amount which Artware owed its various employees, it was "not sufficiently definite and mandatory" to sustain an adjudication of contempt. The basis of this conclusion was not a construction by the court of the special terms of its own decree. This was in terms the order entered by the Board. The court applied what it believed to be a general principle of law that an enforcement decree of a Board order determining liability for back pay, but leaving for a later stage

determination of the specific amounts due to individual employees, is too indefinite to sustain contempt proceedings.

The respondents urge in support of the decision below that after the 1952 decree Artware was entitled to a further administrative hearing to determine whether the conduct of the named employees after their wrongful discharge disentitled them to recover, and that despite the 1952 decree it might therefore ultimately be determined that Artware was not in fact obligated to make any payment whatever. It follows, the argument runs, that since the Board's 1952 order did not purport to adjudicate a liability free of defenses to make back-pay payments, it could not, for purposes of such payments, be considered final. Accordingly, the 1952 decree which in terms enforced it could not embody a final mandate concerning the payments, disobedience of which could constitute contempt.[2]

The Board concedes that the 1952 decree having been entered before any determination of specific amounts owing, it did not direct present payment to be made, and that respondent Artware could not be held in contempt for failure to make payment before the entry of the 1955 decree. But it urges that the 1952 decree could and did impose an immediate and definite obligation upon Artware not to design and execute a plan for the very purpose of disabling itself from obeying the decree which had definitively adjudicated its obligation to pay whatever would be found to be the dollar-and-cents amount of its theretofore established liability. If the allegations in the petition for contempt are sustained by proof, there can

---

[2] The question involved here was not presented for decision in *National Labor Relations Board* v. *New York Merchandise Co.*, 134 F. 2d 949. To the extent that the opinion in that case is inconsistent with the principles here announced, it is of course disapproved.

be no doubt that Artware disregarded this obligation not to frustrate the 1952 decree.

The vital question of the legal implications of enforcement of a Board order rendered in an unfair labor practice proceeding directing reinstatement and payment of back pay, was the sole question dealt with in the opinion below. It was the primary issue between the parties here. It is the issue for our decision. The Board's procedure in unfair labor practice cases is first to hold a hearing to determine whether an unfair labor practice was committed, and, if it was, whether it would "effectuate the policies" of the Act for the Board to order reinstatement with back pay of any employees who were discharged. § 10 (c). In such a proceeding the Board does not concern itself with the amount of back pay actually owing. This is excluded from the proceeding in the interest of the efficient administration of the Act. The determination of specific liabilities may involve a protracted contest. An employee who is wrongfully discharged may, for example, not be entitled to back pay because he failed to accept other employment. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197–200. Since the determination that the discharge was wrongful is subject to review, extensive proceedings to determine the amount of liability may be rendered superfluous by reversal. And if the determination is sustained and becomes final, it may be expedient for a respondent to reach agreement and avoid further litigation. The propriety of this established two-stage procedure of the Board in these back-pay cases is not questioned.

It will not do to hold that because the Board's determination of the duty to make back-pay payments does not result in fixed money judgments, no final order with regard to back pay is in fact entered or enforced. The Board is not, as respondents suggest, merely the statutory

representative of the employees for recovery of their losses.[3] Its primary function under § 10, in connection with which it makes specific monetary orders for specific employees, is to prevent the conduct defined as unfair labor practices in § 8. Section 10 (c) provides that once the Board determines that an unfair labor practice occurred, it may make such remedial orders for reinstatement with back pay as will "effectuate the policies" of the Act. We have held that the Board is granted broad discretion over the fashioning of remedial orders by this provision. *Phelps Dodge Corp.* v. *Labor Board, supra,* at 195–199.

It is plainly within that area of discretion for the Board to order an employer who is found to have violated § 8 by the discriminatory discharge of employees, to refrain from conduct which is solely designed to defeat any remedial back-pay order which may be entered when specific amounts are finally determined. It is equally appropriate for the Court of Appeals, by a decree enforcing the Board's order, to place him at the hazard that if an amount is found to be owing, such conduct subsequent to the decree may be found to be contumacious. The salient fact which brings the Board's remedial power into play under § 10 (c) is its finding that the employer's conduct constituted an unfair labor practice. The separation of that finding from the determination of amounts being an eminently reasonable method for administering the Act, it is irrelevant that as yet undetermined matters subsequent to the discriminatory discharge may in fact disentitle some or all of the employees to receive payment. Cf. *McComb* v. *Jacksonville Paper Co.,* 336 U. S. 187. Enforcement of such a Board order does not inter-

---

[3] *Nathanson* v. *Labor Board,* 344 U. S. 25, is not to the contrary. We there held simply that a back-pay order does not establish a debt owing to the United States and therefore entitled to priority under § 64 (a) (5) of the Bankruptcy Act, 11 U. S. C. § 104 (a) (5).

fere with the ordinary conduct of the respondent's business, or subject it unreasonably to the hazard of contempt. The decree is a form of assurance that business will be conducted with reference to business motives, and not merely so as to evade the remedies designed to enforce the policies of the Act.

It is further urged, however, that even if power exists in the Board and the courts to enter and enforce such an order of liability for back pay in amounts to be ascertained, the 1952 decree contained no such direction. But the decree on its face is an exercise of the equity power to act *in personam* to direct a specific course of conduct. To fail to accord it at least the implied effect of a direction not to act solely for the purpose of defeating it, makes of the decree less than a *brutum fulmen* and transmutes it into a mockery. The Board's determinations are not merely administrative analogues of common-law judgments, and they do not purport to be. As here, they uniformly contain a specific direction to take "affirmative action." In enforcing the Board's orders the Courts of Appeals similarly act not merely to review a common-law judgment, but to "effectuate the policies" of the National Labor Relations Act by enforcement orders directing that action be taken to remove the unfair labor practice found to exist. Every affirmative order in equity carries with it the implicit command to refrain from action designed to defeat it. Such an implication may arise from the mere assumption of jurisdiction as to specific property. See *Merrimack River Savings Bank* v. *Clay Center,* 219 U. S. 527, 535–536. Here, although specific property is not involved, the 1952 order was more than an assumption of jurisdiction. It adjudicated a liability to redress the consequences of a discriminatory discharge. Implicit in that adjudication, and the direction to pay in which it was embodied, was the command to the respondent Deena Artware not to conduct its business and transfer

all its assets for the sole purpose of evading the specific dollar-and-cents obligations in the offing. In the *Merrimack River Savings Bank* case, *supra,* the Court held that "the willful removal beyond the reach of the court of the subject-matter of the litigation or its destruction pending an appeal from a decree praying, among other things, an injunction to prevent such removal or destruction until the right shall be determined, is, in and of itself, a contempt of the appellate jurisdiction of this court." 219 U. S., at 535–536. Our case is *a fortiori* governed by this principle. Here the Court of Appeals had already adjudicated that the respondents were subject to a liability for back-pay wages, and the individualization of the amounts flowing from this liability merely awaited the determination by the Board. The assumption that no money would be due to any of the workers is so fanciful as surely not to be made the basis of the legal assumption that although the Court of Appeals had adjudicated the liability of the respondents, no liability would follow. By putting beyond reach the means for satisfying the dollar-and-cents amount of their liability, the respondents certainly frustrated the Court of Appeals' power to effectuate enforcement of the liability which it had already established.

On the Board's allegations there can be no doubt of the liability of some or all of the other respondents in contempt. Weiner, Products and the subsidiaries are alleged to have been active participants in a deliberate scheme to frustrate enforcement of Artware's liability established by the 1952 decree. The alleged "relations and behaviors" of the several respondents are sufficient to bring them within the terms of Rule 65 (d) of the Federal Rules of Civil Procedure. See *Regal Knitwear Co. v. Labor Board,* 324 U. S. 9, 14–15.

Accordingly, the petition for contempt should have been sustained, and an appropriate motion for discovery

should have been granted. The ground here taken to sustain the petition, of course, makes it unnecessary to consider the Board's alternative theory that all respondents constitute a "single enterprise" and as such are liable in contempt for failure to pay the specific amounts decreed in 1955. That ground should, of course, be open for consideration by the Court of Appeals.