**UNITED STATES STEEL CORPORA-
TION, Plaintiff,**

v.

**UNITED MINE WORKERS OF AMERI-
CA et al., Defendants (two cases).**

**Civ. A. Nos. 75-200 and 75-235.**

United States District Court,
W. D. Pennsylvania.

April 24, 1975.

Leonard L. Scheinholtz, Pittsburgh, Pa., for plaintiff.

Melvin P. Stein, Pittsburgh, Pa., Kenneth J. Yablonski, Washington, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

ROSENBERG, District Judge.

### FINDINGS OF FACT

1. The plaintiff, United States Steel Corporation, is a corporation organized and existing under the laws of the State of Delaware. Through its Maple Creek Mine in Washington County, Pennsylvania, the plaintiff is engaged in the mining and processing of coal which is used by the plaintiff in the production of steel and coal chemicals within the Western District of Pennsylvania. The plaintiff is engaged in an industry affecting commerce as defined in the Labor Management Relations Act of 1947, as amended.

2. The defendant, United Mine Workers of America is an unincorporated labor organization having its principal office at 900 Fifteenth Street, N. W., Washington, D. C. Its duly authorized officers and agents are engaged in representing and acting for certain employees of the plaintiff within the Western District of Pennsylvania for purposes of collective bargaining.

3. The defendant, District No. 5, United Mine Workers of America is an unincorporated labor organization and an administrative division of the United Mine Workers having an office at 938 Penn Avenue, Pittsburgh, Pennsylvania, within the Western District of Pennsylvania. Its duly authorized officers and agents are engaged in representing or acting for employee-members of the United Mine Workers employed at the plaintiff's Maple Creek Mine for purposes of collective bargaining.

4. The defendant, United Mine Workers of America, Local Union No. 1248 is an unincorporated labor organization and is a local labor union of the defendant United Mine Workers. Local 1248 maintains an office in care of Mr. Michael Britvich, President House No. 122, R.D. #1 (Denbo), West Brownsville, Pennsylvania, and is engaged in representing and acting for employee-members of the defendant United Mine Workers at the plaintiff's Maple Creek Mine for purposes of collective bargaining.

5. On February 12, 1975, the plaintiff filed with the United States District Court for the Western District of Pennsylvania, a complaint at Civil Action No. 75–200 against the above-captioned defendants alleging a violation of the National Bituminous Coal Wage Agreement of 1974, between the plaintiff and the defendants which became effective on December 6, 1974 and by its terms continues in full force and effect through December 6, 1977.

6. On February 24, 1975, the plaintiff filed with the United States District Court for the Western District of Pennsylvania, a complaint at Civil Action No. 75–235 against the above-captioned defendants alleging a violation of the National Bituminous Coal Wage Agreement of 1974 between the plaintiff and the defendants which became effective on December 6, 1976, and by its terms continues in full force and effect through December 6, 1977.

7. On March 13, 1975, pursuant to the plaintiff's motion and after hearing, this court issued a Preliminary Injunction enjoining the defendants, their officers, representatives, members and all persons acting in concert with them or acting in their behalf, during the pendency of this Preliminary Injunction and until final determination from:

(a) Engaging in a strike or work stoppage at the plaintiff's Maple Creek Mine located in Washington County, Pennsylvania; or

(b) Picketing or in any other manner interferring with operations at the plaintiff's Maple Creek Mine located in Washington County, Pennsylvania, because of any difference concerning the meaning and application of the provisions of the Agreement or any difference about matters not specifically mentioned in the Agreement or because of any local trouble of any kind arising at the mine.

The aforesaid Order further directed that during the pendency of this Preliminary Injunction and pending final determination:

[T]he defendants, their officers, representatives and members utilize the Settlement of Disputes procedure for the resolution of any further ". . . differences . . . between the Mine Workers and the Employer as to the meaning and application of the provisions of [said] agreement . ." and ". . . differences . . . about matters specifically mentioned in [said] agreement . . ." and ". . . any local trouble of any kind [arising] at the mine . . ." including if necessary, final and binding arbitration; and

[T]hat the defendants' officers, and representatives, pending final determination of this case, take all action which may be necessary to assure compliance with the terms of the 1974 Bituminous Coal Wage Agreement, during pendency of this preliminary injunction.

The court retained jurisdiction of the issues involved and directed that any violation of this Order be reported immediately to the court for appropriate action.

8. The Preliminary Injunction was duly served upon the defendants on March 17, 1975. In addition, copies of the Preliminary Injunction were distributed to all employees of the Maple Creek Mine, both by the Company and the defendants. At all times material, therefore, the defendant, their officers, representatives and members have had actual knowledge and notice of the terms of the Preliminary Injunction issued on March 13, 1975.

9. On April 21, 1975, beginning at 8:01 a. m. the employees of the Maple Creek Mine No. 1 and approximately 85 out of 140 employees scheduled for work at Maple Creek Mine No. 2 reported for work but refused to work as scheduled. At 9:30 a. m. the employees scheduled to work at the Preparation Plant reported for work but refused to work as scheduled, and at 11:30 a. m. the approximately 55 employees who had gone to work at 8:00 at Maple Creek Mine No. 2 left work.

10. The dispute giving rise to the work stoppage involved the suspension, with intent to discharge, of five Maple Creek employees for improperly interfering with a training class for potential maintenance foremen on Saturday, April 19, 1975, at the plaintiff's Filbert Shop, located approximately 20 miles from the Maple Creek Mine.

11. The dispute giving rise to the work stoppage at the Maple Creek Mine is subject to resolution under Article XXIV—Discharge Procedure of the National Bituminous Coal Wage Agreement of 1974.

12. On April 21, 1975, the plaintiff immediately notified the United Mine Workers of America and District 5, United Mine Workers of America, of the existence of the work stoppage and requested that these defendants take prompt action to end the work stoppage. The request to the International Union was contained in a telegram addressed

to Arnold Miller, President of the United Mine Workers of America, and provided as follows:

"This is to inform you that the employees of the Company's Maple Creek Mines #1 and #2, New Eagle, Pa., are engaging in a work stoppage in violation of the labor agreement. The stoppage began with employees scheduled to begin work at 8:00 a. m., Monday, April 21, 1975. District and Local UMWA officials have been notified of the stoppage. The Company requests that you immediately inform the employees involved that this work stoppage is in violation of the National Bituminous Coal Wage Agreement. They should also be informed that the work stoppage should end immediately and that all disputes which are not settled by agreement should be settled through the disputes procedures set forth in the labor agreement."

13. Despite the fact that the Company specifically requested President Miller to disavow the work stoppage, he did not do so.

14. On April 21, 1975 at 1:00 p. m., the membership of defendant Local Union No. 1248 held a special meeting. That meeting was attended by a representative of District 5, but no representative of the International Union attended. The membership of Local Union No. 1248 were urged to return to work and process the dispute concerning the discipline of the five Maple Creek employees through the applicable steps of the grievance-arbitration procedure, but they refused to do so, with the result that the work stoppage continued on the afternoon shift on April 21, 1975 and thereafter on all shifts up to the present time.

15. On April 21, 1975 at approximately 2:30 p. m. the plaintiff filed its Motion for Adjudication of Civil Contempt. Despite the filing of this motion and its service on the defendants on April 21, 1975, no further meeting of Local Union No. 1248 was held until 7:00 p. m. on April 22, 1975, at which time the membership of Local Union No. 1248 was again urged to return to work but refused to do so.

16. As a result of the work stoppage at the Maple Creek Mine, all coal operations and related facilities at the Maple Creek Mine have been shut down. As a consequence, the plaintiff has lost 9,000 tons of coal production per day from the Maple Creek Mine which cannot be replaced from other sources in the market. The replacement cost for the coal produced at the Maple Creek Mine, if such replacement coal was available, would be approximately $42 per ton. Because of the low stock pile of coal produced at the Maple Creek Mine and the plaintiff's inability to replace the lost coal production from other sources in the market, the work stoppage at the Maple Creek Mine has caused, and threatens to cause, serious interference to the plaintiff's coke and steel manufacturing operations, all of which has resulted, and will continue to result, in immediate and irreparable injury to the plaintiff.

17. Neither the International Union nor District 5 have taken any action to discipline any members of Local Union No. 1248 for their conduct in connection with the illegal work stoppage nor have they taken any steps to suspend the atonomy of Local Union No. 1248 as permitted under Articles XV and XVIII of the Constitution of the International Union, United Mine Workers of America.

18. The selection of a succeeding or temporary safety committee could have been made by the President and members of the local union as of any time when the meetings had been called subsequent to a walkout.

19. The refusal and failure of the union members of Local Union No. 1248 to make a selection of the safety committee was a subterfuge for compelling the company to reinstate the five suspended and discharged members and was so stated at one or more of the meetings that unless the men were reinstated they would not go back to work.

**946**

## CONCLUSIONS OF LAW

1. The Preliminary Injunction entered by this court on March 13, 1975 has been in effect since that date and is presently in full force and effect. Since April 21, 1975 at 8:01 a. m. and continuing to the present employee-members of the defendants, United Mine Workers of America, District 5, United Mine Workers of America, and Local Union No. 1248, United Mine Workers of of this court's Preliminary Injunction issued on March 13, 1975, have willfully violated its terms and conditions by engaging in a work stoppage at the Maple Creek Mine over a dispute which is subject to resolution under the terms of Article XXIV of the National Bituminous Coal Wage Agreement of 1974.

2. As stated in Conclusion of Law No. 6 in support of the Preliminary Injunction entered in this proceeding on March 13, 1975, the defendants are responsible for the mass action of their members in resorting to self help through work stoppages in violation of the implied no-strike clause of the labor agreement.

3. The defendants, United Mine Workers of America and Local Union No. 1248, United Mine Workers of America, by their conduct, are in civil contempt of the Preliminary Injunction of this court issued on March 13, 1975.

4. The plaintiff is enitled to immediate help and relief for the enforcement of the Preliminary Injunction entered on March 13, 1975, and for further processing by this Court when and if the circumstances warrant.

## OPINION

Congress has provided that Federal Courts have the power to enforce court orders:

"§ 401. Power of Court

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401."

■ This represents a codification of the inherent and necessary powers of the federal courts. See, Gompers v. Bucks Stove & R. Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1910); N. L. R. B. v. Deena Artware, 261 F.2d 503, C.A. 6, 1958, rev. on other grounds, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400.

The instant case involves a petition for civil contempt. Criminal contempt is not involved.

■ In a proceeding for civil contempt, as distinguished from criminal, the complainant seeks private relief incidental to that sought in the main cause pending between the parties.

"Proceedings for civil contempt are between the original parties, and are instituted and tried as part of the main cause. But, on the other hand, proceedings at law for criminal contempt are between the public and the defendant, and are not a part of the original cause." Gompers v. Bucks Stove & R. Co., *supra*, 221 U.S. at pages 444–445, 31 S.Ct. at page 499.

■ In civil contempt relief results in the imposition of a penalty conditional on a future violation, it is remedial, not punitive.

"Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either of two purposes: to coerce the defendant into compliance with the court's order, and to compensate for losses sustained." United States v. United Mine Workers, 330 U.S. 258, 303, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1946), quoting Gompers v. Bucks Stove & R. Co., *supra*, 221 U.S. at page 418, 31 S.Ct. 492.

In the *Philadelphia Marine Trade Assn.* case [1] the Third Circuit Court of

1. Philadelphia Marine Trade Assn. v. International Long. Assn. L. 1291, 368 F.2d 932, 933, C.A.3, 1966, citing Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed. 2d 622 (1966), rev. on other grounds 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236.

Appeals upheld a citation for contempt in a situation involving an illegal strike:

"The court announced a perfectly clear, simple, and easily applied test for determining whether a penalty imposed in a contempt proceeding is for a civil or criminal contempt. The court said 'The test may be stated as: what does the court primarily seek to accomplish by imposing sentence.'"

In *Philadelphia Marine, supra,* the lower court penalty was held to be for civil contempt; for the court was found to be "primarily, if not solely seeking to put an end to the strike," i. e., compliance with its order.

Thus, even where imprisonment is imposed to vindicate the court authority, the penalty "must be viewed as remedial [and therefore the contempt civil] if the court conditions release upon [compliance]." Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966).

"When the petitioners carry 'the keys of their prison in their own pockets' (cite omitted), the action 'is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees.' (cite omitted)" Shillitani v. United States, *supra,* at page 368, 86 S.Ct. at page 1534.

Although contempt is traditionally an area for great judicial discretion, the court is to an extent under an implicit obligation to grant relief to any injured plaintiff. McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1948). And the "measure of the court's power in civil contempt proceedings is determined by the requirement of full remedial relief." McComb v. Jacksonville Paper Co., *supra,* at page 193, 69 S.Ct. at page 500.

The constituent elements of a civil contempt are knowledge of the court's order, Baglin v. Cusenier Co., 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863 (1910) and an ability to comply with that order. Shillitani v. Untied States,

*supra,* 384 U.S. at page 371, 86 S.Ct. 1531; United States v. United Mine Workers, *supra,* 330 U.S. at page 304, 67 S.Ct. 677. A proceeding in civil contempt does not require indictment and trial by jury. Shillitani v. United States, supra; Pappadio v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966).

In the instant consolidated actions returns of service have been filed evidencing service upon the United Mine Workers of America and its District and Local Union representing employees at the plaintiff's Maple Creek Mine. The defendants clearly had the ability to comply with the Preliminary Injunction by merely reporting to work and working as scheduled.

Moreover, it is well settled that injunctive decrees which run against labor organizations include all members of the organization and that the employee-members at the plaintiff's mine are bound by the decree. Moores Federal Practice 23.11(2), p. 23–2829 (1971).

Similarly, civil contempt lies against individuals who with knowledge of the outstanding order prevent others from obeying that order and induce disobedience.

"All persons who interfere with the proper exercise of the court's judicial function are punishable for contempt. Accordingly, [one who] conspires with others to commit such acts or who procures the commission by another of such an act is also guilty of contempt." 17 C.J.S. § 33, citing O'Malley v. United States, (CCA No.) 128 F.2d 676, appeal dismissed; Pendergast v. United States, 314 U.S. 574, 62 S.Ct. 116, 86 L.Ed. 465; and O'Malley v. United States, 314 U.S. 574, 62 S.Ct. 116, 86 L.Ed. 465, rev. on other grounds, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368.

As was stated in the recent Eastern District of Pennsylvania decision of Farber v. Rizzo, 363 F.Supp. 386, 394–395 (E.D.Pa.1973):

"Civil contempt is intended to enforce compliance with a court order

or to compensate for losses or damages sustained because of a violation of the order. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599; United States v. United Mine Workers of America, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884. A person is liable for civil contempt when he violates the order, N.L.R.B. v. Crown Laundry and Dry Cleaners, 437 F.2d 290, 293 (5 Cir. 1971), with knowledge that the order has been issued, United States v. Hall, 472 F.2d 261 (5 Cir. 1972). Neither wilfulness nor formal service are necessary to a finding of civil contempt. Nor is it a defense to civil contempt that one received erroneous advice from counsel. In re Eskay, 122 F.2d 819, 822 n. 17 (3 Cir. 1941), or a superior, Nelson v. Steiner, 279 F.2d 944 (7 Cir. 1960)."

The instant case is no different from the situation than Bethlehem Mines Corporation v. United Mine Workers of America et al., 3 Cir., 476 F.2d 860 (1973), where striking mine workers disregarded an injunctive order issued by Judge Weber of this Court, and the Third Circuit stated at 476 F.2d 864:

"The integrity of the judicial process demands compliance with court orders until such time as they are altered by orderly appellate review.

"The concept of 'a government of laws and not of men,' describes a critical quality of our political society. So strongly did the framers of the Constitution determine to secure a reign of law that they conferred unusual safeguards on the judicial office. No one, no matter what his position, nor how virtuous his impulse, was to be a judge in his own case.

\* \* \* \* \* \*

"Plaintiff here sought the aid of a court in circumstances attended with some doubt. Only when a court so obviously journeys outside its prescribed range as to be usurping judicial form may an order issued by it be disregarded. Whether a party may be called to the bar of justice is not for that party, himself, to decide.

\* \* \* \* \* \*

"By deliberately disobeying the district court, the defendant attempted to take upon itself the power to determine what is law and, in doing so, subjected itself to civil contempt."

 Here, too, defendants have deliberately disobeyed the District Court and have attempted to take upon themselves the power to determine their own law and, in so doing have subjected themselves to civil contempt.

 While everyone must be concerned with mine safety, the matter has been considered and the principles of law laid down that the men in a mine cannot refuse to go to work because they feel that some safety hazard is involved. Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed. 2d 583 (1974). Thus, the contention of the Local Union membership at their meetings that they could not go back to work unless there was a safety committee in existence, while at the same time refusing to provide themselves with a safety committee of their own choosing, as they were capable of doing unless the five suspended or discharged men were reinstated, vividly sets forth that this pretext was simply a subterfuge to violate both their agreement and the preliminary injunction.

The defense counsel persisted in cross-examining the first witness on such matters of the right and wrong of the dismissal and persisted in arguing that a walkout was justifiable where employees were unjustifiably suspended and dismissed. They did not pursue the right and wrong of the process of suspension dismissal and filing of grievance complaints. From all of this and from what has been presented by defense counsel, I have been given to believe and find that it was the intention of the local union to stand by its own former ideas that they could walk out whenever they felt the company had wronged any of them in any manner

and that they were not required to pursue the grievances and arbitration processes by which they were bound under their agreement.

Thus, what has occurred in the walkout by the local union members from Maple Creek No. 1 and Maple Creek No. 2 mines after the suspension notice was denied at the first meeting caused by the superintendent's evident attempt to comply with Article XXIV of the contract, was indeed adherence to their prior beliefs that they had a right to walk out whenever it suited their purpose and when they believed the company "had done them wrong". This was an exhibition of contemptuous action.

I have no alternative but to hold that the walkout was an intentional stratagem by the local union members to impose their will upon their employers with a deliberate intent to violate the preliminary injunction. This is verified by the fact that each member received a copy of the preliminary injunction from their employer and one from their union representatives. An appropriate decree has been entered.