**UFI RAZOR BLADES, INC., Plaintiff-Appellant,**

v.

**DISTRICT 65, WHOLESALE, RETAIL, OFFICE AND PROCESSING UNION, Affiliated With the Distributive Workers of America, Defendant-Appellee.**

**No. 304, Docket 79-7511.**

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1979.

Decided Oct. 30, 1979.

---

Joel C. Balsam, New York City (Cahill, Gordon, & Reindel, Loretta A. Preska, Joseph I. Loonan, New York City, of counsel), for plaintiff-appellant.

Eugene G. Eisner, New York City (Eisner, Levy, Steel & Bellman, New York City, of counsel), for defendant-appellee.

Before WATERMAN, FEINBERG and TIMBERS, Circuit Judges.

FEINBERG, Circuit Judge:

UFI Razor Blades, Inc. appeals from an order of the United States District Court for the Southern District of New York, Mary Johnson Lowe, J., that found UFI in contempt of a prior order of the district court, imposed a coercive fine upon UFI of $1,000 for each day it remains in violation of that order, and required UFI to post a bond of $300,000. UFI claims that it is not in contempt of the court's earlier order and that the coercive fine was inappropriate. For reasons given below, we are compelled to reverse the finding of contempt and with it the coercive fine, but we do not disturb the requirement of a bond. We remand to the district court for further proceedings in accordance with this opinion.

I

This is the second appeal before us growing out of a labor dispute between UFI and District 65, Wholesale, Retail, Office and Processing Union, Affiliated with the Distributive Workers of America, which for some time has represented the employees at UFI's plant in New York City. The current collective bargaining agreement expires in April 1980. Until recently UFI manufactured various types of razor blades in New York City, reaching a peak complement in 1976 of 130–140 employees working in three shifts. UFI was acquired in that year by Wilkinson Sword, Inc.,[1] and not long there-

---

1. From its acquisition in May 1976 until its liquidation on March 31, 1979, UFI was operat- ed as a wholly-owned subsidiary of Wilkinson Sword, Inc., which was itself a wholly-owned

after production at the New York plant began to fall off. This was apparently due, at least in part, to the foreign production by Wilkinson in England of some blades for UFI accounts. In February 1978, the company advised the union that it would discontinue "some of the operation" at the New York plant, and in March the company made clear that it intended, among other things, to

> Discontinue double edged and Twin II blade processing (manufacture) in the United States and source these products from Wilkinson's operations in England.

The union immediately protested the contemplated layoffs such a move would produce, claiming principally a violation of the provision in the labor agreement prohibiting subcontracting. The company responded that

> . . . we do not regard the sourcing of blades from England as subcontracting, as they are produced within the company . . . [T]he labor agreement expressly permits the company to source this product with its foreign operations . . . the company has chosen to cease U.S. production of double edge and twin blades because the machinery in the U.S. is worn. . . .

The dispute was then submitted to arbitration, in accordance with the labor contract. After hearing the evidence from the parties, the arbitrator in June 1978 ruled for the union in an 11-page opinion, which noted that:

> The circumstances of this matter clearly establish that manufacturing previously performed by bargaining unit employees has been sublet to Wilkinson's plants in England, or perhaps elsewhere, but in any event, well outside the contract's thirty-five mile "no moving" limitation. It is equally clear that the importation of Twin II blades brought on a series of layoffs of employees who previously had been manufacturing the same blades.

The arbitrator's award provided as follows:

> The Employer violated Articles 7 (NO MOVING) and 8 (SUB–CONTRACTING) of the collective bargaining agreement.
>
> The Employer is directed to cease and desist from violating Articles 7 and 8 of the contract.
>
> The Employer is directed to reinstate to their jobs those employees who were layed off subsequent to the purchase of UFI Industries Razor Blades, Inc. by Wilkinson Sword, Inc., and to reimburse each of them for the wages lost by them because of the wrongful layoffs under the contract.
>
> In the event the parties can not agree on the payments due and owing by the Employer and to whom those payments are forthcoming under this Award, the undersigned arbitrator shall retain jurisdiction of this matter in order to hear and determine only those issues.

The company then moved to vacate the arbitration award, and the union moved to confirm it. In a Memorandum Opinion, dated September 21, 1978, Judge Lowe denied the company's motion and granted the union's. On the same day, the judge issued an order that confirmed the award "in all respects," stated that the company had violated the labor contract, and included in its decretal paragraphs the following:

> . . . UFI Razor Blades, Inc., is directed to cease and desist from contracting out manufacturing work in violation of Articles 7 and 8 (the No Moving and Sub-Contracting clauses) of the collective bargaining agreement between the parties, and . . .
>
> . . . UFI Razor Blades, Inc. . . . is hereby directed to reinstate to their jobs those employees who were laid off

subsidiary of Wilkinson Match (USA), Inc. The latter entity in turn was wholly owned by various interrelated British corporations. Effective March 31, 1979, UFI was liquidated and its assets transferred to Wilkinson Sword, Inc., which now stands as successor in interest to UFI in this proceeding. Hereinafter, we shall frequently use "company" to refer to UFI or, with regard to the period after March 31, 1979, to its successor in interest, Wilkinson Sword, Inc.

subsequent to the purchase of UFI Industries Razor Blades, Inc. by Wilkinson Sword, Inc., and to reimburse each of them for the wages lost by them because of the wrongful layoffs under the contract, and   . . .

. . . UFI Razor Blades, Inc. is hereby barred from discharging or laying off any further employees due to Petitioner's violations of Articles 7 and 8 of the collective bargaining agreement, and . . .

. . . UFI Razor Blades, Inc. is directed to cease and desist from any activities in violation of said award and, . . .

. . . in the event the parties cannot agree on the payments due and owing by the petitioner UFI Razor Blades, Inc. pursuant to the Award to those employees who were laid off subsequent to the purchase of UFI Industries Razor Blades, Inc. by Wilkinson Sword, Inc., this matter shall be remitted to [the] Arbitrator . . . in order to hear and determine that issue. . . .

This September 21, 1978 order (hereinafter "the September 21 order") was the subject of the company's first appeal to this court. In February 1979, a panel summarily affirmed the judgment of the district court "on the opinion of Judge Lowe." In April 1979, after a fruitless exchange of letters and a meeting between union and company representatives, the union moved in the district court for an order holding the company in contempt of the September 21 order. Judge Lowe, with the approval of the parties, referred the motion to the arbitrator as a Special Master to hear and report whether the company had complied with that order. The Special Master heard testimony and issued a report, dated May 23, 1979, in which he found that the remedies required by the September 21, 1978 order "have been ignored" and that the order was not complied with "in any respect."

After hearing argument on the Special Master's report, Judge Lowe issued an order dated July 18, 1979, finding the company in contempt. By a subsequent memorandum opinion and order dated July 25, 1979, Judge Lowe fined the company $1,000 for each day it "remains in violation" of any provision of the September 21 order and directed it to post a bond in the amount of $300,000 "to facilitate the collection of any monetary award subsequently imposed." This appeal followed, and on July 30, 1979, a single member of this court stayed that portion of the contempt order imposing the $1,000 per day fine. Thereafter, a full panel vacated the stay, but expedited the appeal.

## II

On this second appeal to us, the company claims initially that it is not in contempt of either the prohibitory or affirmative provisions of the September 21 order. Thus, with regard to the provisions that prohibit violations of the "no moving" and "sub-contracting" articles of the collective bargaining agreement, the company asserts that it has at no time following September 21, 1978 subcontracted out or moved work, discharged workers as a result of subcontracting or moving, or engaged in any other activity in violation of the award. Similarly, with regard to the provisions of the order requiring reinstatement and back pay for workers wrongfully laid off, the company contends that the failure adequately to identify the workers to be reinstated, and to liquidate the sums to be paid, creates an ambiguity that prevents a finding of contempt; in addition, the company argues that there is no work for the employees laid off, and thus the company cannot be in contempt for failing to reinstate them. The union responds that the September 21 order implicitly required the company to resume the discontinued production of razors in New York, that no formal offer of reinstatement has been made, and that the company had a duty to seek a clarification if it found the September 21 order ambiguous. In short, the union takes the position that the company has not made the slightest effort to comply with the award.

The issues raised by this appeal cut across not only the law of civil contempt, but also a seldom explored area of labor law. In analyzing this case, it is essential to keep in mind the distinction between the company's contractual obligations prior to September 21, 1978, and those obligations subsequently imposed upon it by the September 21 order. It is clear that the company violated its contract with the union in 1977 and early 1978. During that period, the company cut back on, and finally ceased, the manufacture of certain types of razor blades in New York City and had such work done elsewhere, thereby causing the layoff of a number of employees. Although the company claimed to have the right to take this action, the arbitrator found the company's position incorrect in light of the "no moving" and "sub-contracting" articles of the collective bargaining agreement. The arbitrator's finding was confirmed by the district court and by this court on appeal. There can be no claim now that those contractual promises were invalid or inoperative or that they were not breached.

But establishing a contract violation prior to September 21, 1978 does not decide the principal issue on this appeal, which is whether the company subsequently violated the court's order of that date. The company's argument that no violation occurred after that time is really twofold. First, the company asserts that it failed to resume production and reinstate workers not because it is doing the New York work elsewhere, but because by September 21 economic conditions and business considerations were such that the New York employees would have been laid off in the ordinary course of business. Second, while apparently conceding that some of the work at the New York plant would have continued for a short indeterminate period beyond the early months of 1978 had there been no subcontracting, the company argues that it cannot be held in contempt for failure to make back payments until there has been a determination of which employees would have done that work and for how long. Because the Special Master and the district judge did not focus with precision on these argu-

ments, the record is inadequate in several respects. We therefore reluctantly reverse and remand for further proceedings.

■ To illustrate why this record is incomplete, it is helpful to examine the procedures followed by the National Labor Relations Board in the analogous context of an unfair labor practice proceeding. Where there has been a subcontracting violation, the Board may order resumption of the discontinued operations along with reinstatement with back pay, so long as the order will not impose an undue or unfair burden on the company. *See Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215–17, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Cases drawn from the NLRB context indicate, however, that restoration of production will not be required when it would be too financially burdensome for the employer. *See, e. g., NLRB v. Townhouse TV & Appliances, Inc.*, 531 F.2d 826, 831–32 (7th Cir. 1976) (requiring bargaining with union and reimbursement of lost wages, but refusing to require reestablishment of operations or reinstatement where employer subcontracted for business reasons as well as antiunion considerations); *see also* Section of Labor Relations Law, ABA, *The Developing Labor Law* 272 (Supp.1977). Similarly, an employer will not be required to reinstate workers if their jobs no longer exist. *See, e. g., NLRB v. Kostilnik*, 405 F.2d 733, 735 (3d Cir. 1969); *NLRB v. Vail Mfg. Co.*, 158 F.2d 664, 667 (7th Cir.), *cert. denied*, 331 U.S. 835, 67 S.Ct. 1517, 91 L.Ed. 1848 (1947), *cert. denied*, 334 U.S. 845, 68 S.Ct. 1514, 92 L.Ed. 1769 (1948); *State Wide Painting & Decorating Co., Inc.*, 70 LRRM 1095 (NLRB 1969). While several cases suggest that a court of appeals may enforce a reinstatement decree despite the employer's assertions that the jobs no longer exist, these holdings are premised on the assumption that the employer will have a later opportunity to prove to the Board that reinstatement is no longer possible. *See, e. g., NLRB v. Bell Co., Inc.*, 561 F.2d 1264, 1266 n.2 (7th Cir. 1977); *NLRB v. Kostilnik, supra*, 405 F.2d at 735; *cf. Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct.

452, 86 L.Ed. 718 (1942); *NLRB v. Family Heritage Home-Beaver Dam, Inc.*, 491 F.2d 347, 351 & n.5 (7th Cir. 1974).

■ The Board's procedures also shed some light on the specificity required of an underlying order before a finding of contempt may be made. It is the practice of the Board not to fix the amount of back pay that will be required of an employer who has wrongfully laid off employees until a court first has enforced a Board order that directs reimbursement in general terms. *See Dayton Tire & Rubber Co. v. NLRB*, 591 F.2d 566, 571–72 (10th Cir. 1979); *NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103 (7th Cir.), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Recognizing that efficiency is served by this two-stage process, courts have not questioned its propriety. *See NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 411, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring). In an early opinion, however, this court suggested that one of the consequences of the Board's two-stage proceedings was that an employer cannot be held in contempt for failure to make payments under an order requiring back pay until the amount of back pay has been fixed. *NLRB v. New York Merchandise Co.*, 134 F.2d 949, 952 (2d Cir. 1943) (L. Hand, J.).[2]

■ We see no reason not to apply these doctrines in the area of labor arbitration. An arbitrator, like the NLRB, may order resumption of operations and reinstatement with back pay as remedies for subcontracting violations. *See United Electrical Radio & Machine Workers of America v. Honeywell, Inc.*, 522 F.2d 1221, 1226–27 (7th Cir. 1975) (citing authorities). In *Selb Mfg. v. IAM, District No. 9*, 305 F.2d 177 (8th Cir. 1962), for instance, the court of appeals affirmed a district court order that enforced an arbitration award interpreting a "sub-contract" clause similar to the one in question here. The arbitration award required the employer to return to St. Louis the work and equipment that it had transferred to plants in Arkansas and Colorado and to reinstate, without loss of pay or seniority, all of the St. Louis employees laid off after a certain date.[3] But, as in the NLRB context, an employer should not be foreclosed from showing that compliance with a resumption or reinstatement order is no longer possible because of changed economic circumstances. Similarly, we believe that an arbitration award, like a Board order, must state with specificity both the employees to be reinstated and the amount of back pay owed before an employer may be held in contempt for failure to reinstate employees or to make back payments to them.

2. We recognize that Justice Frankfurter disapproved of *New York Merchandise* to the extent that it was inconsistent with the principles announced in his concurrence in *NLRB v. Deena Artware, supra*, 361 U.S. at 410 n.2, 80 S.Ct. 441. In *Deena Artware*, the Board sought a civil contempt citation against an employer that allegedly conveyed its assets to a related corporation so as to frustrate an earlier court-enforced Board order requiring reinstatement with back pay of certain named employees. The circuit court held that its enforcement order, which left unliquidated the amount of back pay to which employees would be entitled, was too indefinite to serve as the basis for contempt, *see NLRB v. Deena Artware*, 261 F.2d 503, 510 (6th Cir. 1958); a majority of the Supreme Court reversed on other grounds. In contrast, Justice Frankfurter, in a concurrence joined by Justice Harlan, would have reversed on the ground that the employer could be held in contempt for conduct solely designed to defeat a subsequent order liquidating the back-

pay obligation. *See NLRB v. Deena Artware, supra*, 361 U.S. at 412, 80 S.Ct. 441. As Justice Frankfurter noted, id. at 410 n.2, 80 S.Ct. 441, the question presented in *Deena Artware* was not before this court in *New York Merchandise*. While we believe that the latter case is still valid authority for the proposition for which it is cited in text, our opinion should not be read to suggest that an employer is immune from contempt proceedings if he actively seeks to frustrate—e. g., by transferring assets—later implementation of an existing court order requiring payment of an unliquidated amount of back pay. *See* L. Jaffe, *Judicial Control of Administrative Action* 303 (1965).

3. The later case history of *Selb* indicates that there was a monetary settlement rather than actual resumption of production in St. Louis. *See Layton v. Selb Mfg. Co.*, 359 F.2d 715 (8th Cir.), *cert. denied*, 385 U.S. 929, 87 S.Ct. 288, 17 L.Ed.2d 211 (1966).

Turning from these labor law decisions to the law of contempt, it is common ground that courts must be careful in employing that sanction because the "judicial contempt power is a potent weapon." *See Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). Thus, several recent cases have held that contempt cannot issue unless the underlying decree requires the alleged contemnor to pay a specific sum. *See Lichtenstein v. Lichtenstein*, 425 F.2d 1111 (3d Cir. 1970) (failure to pay deficiency; order merely provided means of determining liability); *Baumrin v. Cournoyer*, 448 F.Supp. 225 (D.Mass.1978) (same). These cases reflect the general proposition that an order of contempt cannot issue unless the order claimed to be violated is specific and definite. *See, e. g., In re Rubin*, 378 F.2d 104, 108–09 (3d Cir. 1967).

With these principles in mind, we now consider the issue whether the company was properly held in contempt of the September 21 order of the district court. That order directed the company to reinstate employees who had been laid off after Wilkinson took control of the New York operation and to reimburse them for wages lost "because of the wrongful layoff under the contract."[4] The number and identity of these employees is not clear in the record before us. There is apparently a dispute between the parties as to how many employees were so affected, and there is unquestionably a dispute over how long work would have continued for these employees; in fact, in a letter dated March 14, 1979, the union itself suggested that it would be prepared to meet with the company to discuss which employees should be reinstated and the amount of money due them. Neither the arbitrator's award in June 1978 nor the subsequent September 21 order specifically identifies the employees to be reinstated or the amount of money due them; indeed,

both the award and the order specifically provided that the issue of back pay should be remitted to the arbitrator if the parties were unable to agree as to the payments due and owing. Moreover, the subsequent proceeding before the arbitrator sitting as a Special Master, which should be likened to a second-stage compliance hearing before the NLRB, still did not resolve these questions.

The union argues that in any event the company is surely in contempt of the order because after September 21 it did not resume blade production in New York. While the order does not directly compel resumption of work, we think that is a fair reading of the order and we would not cavil at the contempt finding were that the only question. But the true issues relate to what work should have been resumed in New York City after September 21 and whether that work was at that time being done elsewhere instead. The arbitrator, as Special Master, apparently assumed that the company was required to resume production of blades in New York simply because after September 21 Wilkinson produced them elsewhere. This is not so. The September 21 order required the company to transfer back to UFI's New York facility any Twin II and double edge razor blade production work that previously had been performed there and was at that time being performed elsewhere in the Wilkinson corporate group; the company, however, was not under an obligation to transfer to the New York facility any work that had been done elsewhere in the Wilkinson corporate group before the labor dispute arose and had never been done at the New York facility. The proceedings before the Special Master apparently did not focus with the necessary precision on these issues, i. e., exactly which Twin II and double edge razor blade production work had been transferred out of the New York facility to be performed elsewhere in the Wilkinson corporate group, and, both for purposes of fixing contract damages and determining whether the com-

4. Although the September 21 order might be construed to direct the company to reinstate and reimburse all "employees who were laid off subsequent to the purchase of UFI Industries Razor Blades, Inc., by Wilkinson Sword, Inc.," we believe that the arbitrator and the district judge intended to require the reinstatement only of employees wrongfully laid off after that date because of the company's violation of the labor contract.

pany was in contempt of the September 21 order, the precise duration of this prohibited transfer of work. Undoubtedly for this reason, in the contempt proceeding the Master and subsequently the district court made no specific finding that the company after September 21, 1978 did Twin II and double edge razor blade production work elsewhere in the Wilkinson corporate group that earlier had been transferred from the New York facility.

Thus, we are reluctantly compelled to reverse the order finding appellant in contempt and imposing a prospective fine, and to remand for further development of the record and further findings. Our reluctance stems from the impression that the Special Master and the district court correctly divined the company's true intentions. But impressions or vague feelings cannot substitute for evidence and specific findings based upon them. We do not know what the outcome of further proceedings will be, but our concern is lessened by the presence of a bond of $300,000, which the district judge sensibly required when she was informed that the company was preparing to dismantle its New York plant. In view of what has transpired thus far, we see no reason to reverse that portion of the order. If the company does have to pay a sizeable sum of money to reimburse those who have been improperly laid off as a result of contract violations—at least for the period up to termination of the labor contract in April 1980—the employees involved will have some security for satisfaction of that obligation. Indeed, nothing in this opinion is meant to preclude the district court from requiring a bond in an even larger amount, if the evidence before it after remand justifies that course.[5]

Order reversed in part and case remanded for further proceedings consistent with this opinion.

---

5. Since we reverse the finding of contempt, we need not consider appellant's arguments concerning the propriety of the coercive fine, which falls with the contempt finding.